SCHLUMBERGER TECHNOLOGY
CORPORATION and Schlumberger
Limited, Petitioners,

v.

John SWANSON, et al., Respondents.

No. 95–0355.

Supreme Court of Texas.

Dec. 11, 1997.

Linda L. Addison, Roger Townsend, Joy M. Soloway, Hugh E. Tanner, Blake Tartt,

Houston, Ben Taylor, Dallas, Joe R. Greenhill, Austin, for petitioners.

F. Eric Fryar, Evelyn Jo Wilson, Houston, Franklin Jones, Jr., Marshall, Douglas Laycock, Russell J. Weintraub, Austin, Kendall C. Montgomery, Houston, Stephen D. Susman, Dallas, John M. O'Quinn, Houston, Luther H. Soules, III, San Antonio, William Powers, Jr., Pamela Stanton Baron, Austin, for respondents.

ENOCH, Justice, delivered the opinion of the court.

This is a commercial dispute. In settling this dispute, the Swansons signed a release that disclaimed reliance on the representations of Schlumberger. The question is whether this disclaimer precludes, as a matter of law, the Swansons from recovering damages against Schlumberger for fraudulently inducing them to settle. The trial court granted a judgment for Schlumberger notwithstanding the jury's verdict for the Swansons. The court of appeals reversed, holding that the disclaimer of reliance did not preclude the Swansons' fraudulent inducement claim. 895 S.W.2d 719. We agree with the trial court. Accordingly, we reverse the court of appeals' judgment and render judgment for Schlumberger.

## I. FACTS

In the 1970s, John Swanson and his brother George Swanson approached SEDCO, Inc. about a proposal to mine diamonds from the ocean floor in deep waters off the South African coast. SEDCO had expertise in offshore oil and gas drilling and had mined manganese nodules off the ocean floor. The Swansons, whose family had been in the mining industry in South Africa for several decades, had contacts with the South African government. By letter dated October 17, 1978, SEDCO agreed to a three-phase project. In Phase I, SEDCO would study the feasibility of the sea-diamond project. In Phase II, a lease was to be acquired and prospecting was to begin. Phase III was to be commercial mining. The agreement provided that SEDCO had exclusive authority to determine whether to proceed with Phases II and III.

The Swansons were to use their goodwill and contacts to obtain concession rights and any licenses or permits the South African government required. They also were to provide SEDCO with information on diamond mining generally and offshore mining specifically. For their part, the Swansons would be paid a consulting fee through Phases I and II and a royalty, if any, on any diamonds mined during Phases II and III. Should the project ever become commercially productive, the Swansons had the right to purchase five percent of the shares in the company contemplated to be formed to mine the diamonds. SEDCO was to bear the expense of all phases of the project, with the exception of the Swansons' own out-of-pocket expenses. Any diamond grants or offshore concessions or leases were to be held by SEDCO, by the company to be formed, or by the Swansons, but as trustees.

SEDCO completed Phase I in 1979 and opted to proceed with Phase II. In July 1983, SEDCO and George E. Swanson Enterprises, as co-lessees, obtained a prospecting lease, Lease 3C, from the South African government. At the same time, the South African government issued leases on surrounding tracts to other companies. DeBeers Mining Consolidated Limited (DeBeers) obtained Leases 4C and 5C immediately to the south; African Selection Trust Exploration (Pty.) Limited (Seltrust), a subsidiary of British Petroleum, obtained Lease 2C to the north.

Almost immediately after receiving the leases, SEDCO, DeBeers, and Seltrust began negotiating a joint venture agreement to jointly develop the mining project. In December 1984, before this joint venture agreement was finalized, Schlumberger Technology Corporation acquired SEDCO by merger and formed Sedswan Diamonds (Pty.), Limited, a wholly-owned South African subsidiary, to continue the sea-diamond project. Sedswan then entered into the joint venture with DeBeers and Seltrust in February 1985. Around the same time, the South African government reissued Lease 3C in Sedswan's name only and without reference to George E. Swanson Enterprises. Sedswan, DeBeers, and Seltrust participated in the joint venture through 1986. In early January

1987, the Swansons became concerned about rumors that Schlumberger was going to stop funding its share or withdraw from the joint venture. Further, they were disturbed about the lack of information they were receiving on the project's progress. Consequently, the Swansons consulted a lawyer. Their objectives were to ensure that Schlumberger stayed in the joint venture and that their rights under the original letter agreement, which predated the joint venture agreement, were enforced. Of particular concern to the Swansons was the effect of the joint venture agreement on the Swansons' interests, including Schlumberger's ability to dilute Sedswan's joint venture interest after an initial investment, the right of first refusal given to the other joint venture members, and a confidentiality agreement.

Shortly after the Swansons hired their lawyer, Schlumberger gave notice to DeBeers and Seltrust of its intent to withdraw Sedswan from the joint venture. As required by the joint venture agreement, Schlumberger offered to sell Sedswan's interest to the remaining joint venture members. DeBeers and Seltrust rejected this offer, each refusing to buy out Sedswan's interest so long as it was subject to any rights the Swansons may claim.

During the next thirteen months, Schlumberger negotiated its withdrawal from and a price for Sedswan's joint venture interest with DeBeers and Seltrust. Schlumberger initially offered to sell Sedswan's interest for twenty-five million dollars plus a royalty. DeBeers and Seltrust rejected this offer and countered at ten million rand. Schlumberger dropped its demand for a royalty and offered to sell for thirty-five million dollars. Again, DeBeers and Seltrust rejected this offer, holding firm at ten million rand.

Throughout this time, Schlumberger discussed the various proposals with the Swansons, communicating mostly through their lawyer. According to the Swansons, Schlumberger represented to them that the sea-diamond project was neither technologically feasible nor commercially viable, but refused to give them joint venture progress reports and other information and data supporting Schlumberger's views. During these negotiations, Schlumberger also disputed the validity of the Swansons' rights and interests in the joint venture, claiming that the joint venture agreement altered whatever rights the Swansons had. Displeased with Schlumberger's decision to withdraw Sedswan from the joint venture and concerned about Schlumberger's assertions disputing their interests and its unwillingness to turn over joint venture information, the Swansons contemplated suing Schlumberger but did not.

Instead, in February 1988, a little more than a year after Schlumberger gave notice of its withdrawal from the joint venture, the Swansons agreed that Schlumberger would buy their interest for two million South African rand (about $814,000). In exchange, the Swansons relinquished all rights, claims, and interests in the offshore diamond project and Lease 3C and released all causes of action against Schlumberger, known or unknown. In the release, the Swansons specifically agreed that they were not relying on any statement or representation of Schlumberger, SEDCO, or Sedswan, that they were relying on their own judgment, and that they had been represented by counsel who had explained the entire contents and legal consequences of the release.

Schlumberger thereafter sold Sedswan's interest to DeBeers and Seltrust for 10 million rand (about $4,100,000). After recouping its investment in the project of 6.8 million rand (about $2,767,000), buying out the Swansons' interests for two million rand (about $814,000) and paying them an additional $200,000 in consulting fees, Schlumberger netted 778,000 rand (about $319,000) from the offshore diamond project.

Asserting that Schlumberger had misrepresented the project's viability and value, the Swansons then sued Schlumberger and its parent corporation, Schlumberger Limited, Inc., for fraudulently inducing them to sell their interest at an undervalued price. The Swansons also alleged breach of fiduciary duty.

The jury found for the Swansons and against Schlumberger on all issues. The jury awarded the Swansons fifteen million dollars in actual damages, thirty-five million

dollars in exemplary damages on a statutory fraud claim under section 27.01 of the Texas Business and Commerce Code, ten million dollars in exemplary damages on the common law claims, and attorney's fees. As already mentioned, the trial court rendered a judgment notwithstanding the verdict, but the court of appeals reversed and rendered judgment in accordance with the jury's findings. 895 S.W.2d 719.

Here, Schlumberger contends that the release precludes all of the Swansons' claims as a matter of law; that there is no evidence of common law fraud, statutory fraud under section 27.01 of the Texas Business and Commerce Code, or breach of fiduciary duty; and that the court of appeals erred in awarding prejudgment interest on future damages. We agree that the release precludes all of the Swansons' claims as a matter of law. Accordingly, we reverse the court of appeals' judgment and render judgment for Schlumberger. Because of our disposition, we need not reach the prejudgment interest issue.

## II. RELATIONSHIP OF THE PARTIES

Schlumberger argues that the Swansons' fraud claims are barred as a matter of law because the Swansons were represented by legal counsel throughout the arm's-length negotiations between the parties. Schlumberger contends that when a party is represented by counsel and that party agrees that, in signing a release, it is not relying on any statement or representation of the party to be released, the presence of independent legal advice breaks the chain of both reliance and causation. Schlumberger reasons that if parties can refute their reliance, even though they were represented by counsel when they settled their claims, litigation never ends. This is so, Schlumberger says, because dissatisfied parties could always break their settlement by claiming that the other party, through its misrepresentations, fraudulently induced them to enter into the settlement or release.

Important to Schlumberger's position is its assertion that it was negotiating with the Swansons at arm's length. Schlumberger contends that it openly disputed the validity of the Swansons' interests in the sea-diamond project. Schlumberger further contends that,by virtue of the extended adversarial negotiations through legal counsel over the Swansons' rights and the buyout of their interests, if any, Schlumberger did not owe a fiduciary duty to the Swansons during the negotiations.

The Swansons respond, however, that there was a long-standing fiduciary relationship that arose either because Schlumberger and the Swansons were partners or because they were parties to a confidential relationship. Given that relationship, the Swansons argue, Schlumberger cannot unilaterally eliminate the fiduciary duty by generating a dispute with the Swansons.

As the relationship between the parties informs both parties' arguments on the effect of the disclaimer of reliance, we must first determine the nature of that relationship.

### A. PARTNERSHIP

In *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 788 (1938), we held that a partner selling his interest to another partner has a fiduciary duty requiring full disclosure of all important information about the value of the interest. This is true, we said, even though the partners had strained relations and one partner had sued for an accounting and dissolution of the partnership. *Johnson*, 120 S.W.2d at 788. "If the existence of strained relations should be suffered to work an exception [to the fiduciary relationship], then a designing fiduciary could easily bring about such relations to set the stage for a sharp bargain." *Id.* We concluded that more mischief would result from relieving the fiduciary of his duty to make full disclosure than from requiring adherence to his fiduciary responsibilities. *Id.* If Schlumberger and the Swansons were partners, *Johnson* counsels that their negotiations terminating their relationship would not be at arm's length, but would be conducted under the higher fiduciary standard requiring full disclosure.

Schlumberger does not challenge *Johnson* on principle, but contends that there is no evidence of a partnership between it and the Swansons. We agree.

At the outset, we note that the Legislature revised the Texas Uniform Partnership Act in 1993, effective January 1994. Act of May 31, 1993, 73d Leg. R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887. As the Swansons and SEDCO originally formed their enterprise in 1978, the pre–1993 statute and case law decided under that statute control our determination. *See* TEX.REV.CIV. STAT. ANN. art. 6132b, § 47.

■ Under the Texas Uniform Partnership Act, a partnership or joint venture is an association of two or more persons to carry on as co-owners a business for profit. TEX. REV.CIV. STAT. ANN. art. 6132b, § 6. As the issue was submitted to the jury, a partnership consists of an express or implied agreement containing four required elements: (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *See Coastal Plains Dev. Corp. v. Micrea, Inc.,* 572 S.W.2d 285, 287 (Tex.1978). Accordingly, if there is no evidence of any one element of a partnership, we cannot sustain the jury's affirmative finding.

■ We conclude that there is no evidence of an agreement to share profits. The undisputed evidence is that the Swansons were to receive a royalty on diamonds mined in Phases II and III and that their royalty was to be paid before expenses. Entitlement to a royalty based on gross receipts is not profit sharing. *See* TEX.REV.CIV. STAT. ANN. art. 6132b, § 7(3) (sharing gross returns does not itself establish partnership); *see also Patton v. Callaway,* 522 S.W.2d 252, 256 (Tex.Civ. App.—El Paso 1975, writ ref'd n.r.e.). Of course, the payment of consultation fees is not the sharing of profits. Such payments are compensation for services rendered and are unrelated to the venture's profits. *See Grimmett v. Higginbotham,* 907 S.W.2d 1, 2–4 (Tex.App.—Tyler 1994, writ denied) (weekly compensation unrelated to financial requirements of business is no evidence of agreement to share profits or losses); *Gutierrez v. Yancey,* 650 S.W.2d 169, 172 (Tex. App.—San Antonio 1983, no writ) (partners must participate in profits and share them as principals of business and not as compensation).

■ The Swansons further urge, though, that an agreement to share profits is evidenced by the fact that they received part of the sale proceeds for Sedswan's joint venture interest. But this is evidence only that the Swansons may have had an interest in the sea-diamond project. It is circular to contend that the payment in settlement of the Swansons' disputed interests proves those interests. The two million rand Schlumberger paid the Swansons to settle and release their claimed interests in the sea-diamond project is no evidence of an agreement to share partnership profits.

■ Because there is no evidence of an agreement to share profits, there is no evidence of a partnership under the question submitted to the jury. This conclusion renders unnecessary any consideration of Schlumberger's other evidentiary contentions on the remaining elements of a partnership. We conclude that the Swansons and Schlumberger were not partners.

## B. CONFIDENTIAL RELATIONSHIP

The Swansons claim that even if the technical requirements of a partnership are not satisfied, they were nonetheless owed a fiduciary duty by Schlumberger arising out of a confidential relationship. Agreeing with the Swansons, the jury found that between January 1987 (when Schlumberger decided to withdraw Sedswan from the joint venture) and October 1988 (when the release was finally signed and the transaction closed), Schlumberger and the Swansons had a relationship of special trust and confidence and that Schlumberger breached its fiduciary duty arising from that relationship by making representations that fraudulently induced the Swansons to sign the release.

■ An informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one. *See Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962); *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951). But not every relationship involving a high

degree of trust and confidence rises to the stature of a fiduciary relationship. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992). In order to give full force to contracts, we do not create such a relationship lightly. *See Thigpen*, 363 S.W.2d at 253. Accordingly, while a fiduciary or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit. *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex.1995). In this case, there is no evidence that a prior fiduciary relationship had arisen between the Swansons and Schlumberger.

We recognize that the Swansons testified that they trusted and relied on Schlumberger to negotiate a fair price with DeBeers and Seltrust for Sedswan's interest in the joint venture. However, mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship. *See Crim Truck*, 823 S.W.2d at 595. In addition, though, the Swansons point out that certain Schlumberger and SEDCO executives testified that the Swansons were their "partners" in the sea-diamond project, and that the original lease application to the South African government and the original lease from the South African government provided that SEDCO and the Swansons were partners. The Swansons maintain that this evidence established, at the very minimum, that both parties believed a confidential relationship existed, providing some evidence to support the jury's finding. Again, the fact that the parties to a transaction trust one another will not, in and of itself, establish a finding of a confidential relationship. *See Thigpen*, 363 S.W.2d at 253. Instead, to impose such a relationship in a business transaction, " 'there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit.' " *Tyra v. Woodson*, 495 S.W.2d 211, 213 (Tex.1973) (quoting *Consolidated Gas & Equip. Co. v. Thompson*, 405 S.W.2d 333, 336 (Tex.1966)). As we have said, there is no evidence of a prior fiduciary relationship in this case.

The Swansons next rely on evidence that Schlumberger thought it had an obligation to get the best deal it could for itself and the Swansons, to "put the Swansons' interest at least equal" to its own, and that it was representing the Swansons' interest in negotiating with DeBeers and Seltrust. This evidence proves only that Schlumberger's interests were aligned with the Swansons' to obtain the best possible price for Sedswan's joint venture interest and, to that end, Schlumberger spoke not only for itself, but also for the Swansons. To permit any further inference would impose a fiduciary relationship in every contract because all contracting parties presumably contract for their mutual benefit. Once again, the fact that Schlumberger and the Swansons were aligned does not create a confidential relationship giving rise to a fiduciary duty in the absence of a prior relationship.

Finally, the Swansons argue that *Manges v. Guerra*, 673 S.W.2d 180 (Tex.1984), imposes a fiduciary duty on Schlumberger. In *Manges*, we recognized that a holder of executive rights to a mineral estate owes a fiduciary duty to the non-executive interest. 673 S.W.2d at 183. That is not the situation here. *Manges* simply is inapposite.

We conclude that there is no evidence of a partnership or confidential relationship between Schlumberger and the Swansons that would give rise to a fiduciary duty on Schlumberger's part.

### III. DISCLAIMER OF RELIANCE

Given that Schlumberger and the Swansons were dealing with each other at arm's length, we now turn to Schlumberger's contention that the disclaimer of reliance clause in the release precludes the Swansons' fraudulent inducement claim. It does.

To support their fraudulent inducement claim, the Swansons alleged that Schlumberger made several affirmative misrepresentations during their negotiations over the withdrawal of Sedswan from the joint venture. The Swansons had seen an April 1986 Schlumberger evaluation that described the project as "economical," but noted that the "commerciality" of the project would not be

determined until 1988 or 1989. Despite the 1986 evaluation, and without having undertaken any later studies, Schlumberger represented to the Swansons that the project was neither technologically feasible nor commercially viable. In addition, Schlumberger represented that the project had a negative value and that Sedswan would be lucky to get out with its costs.

At trial, the evidence was undisputed that there are diamonds on the ocean floor off South Africa. It was further undisputed that, as of the time of trial in 1993, no one had begun mining diamonds. Also, it was undisputed that Seltrust's successor sold its interest to DeBeers in 1992 for only slightly more than its project costs. On the other hand, there was substantial dispute about whether the project was technologically feasible or commercially viable. Schlumberger brings a point of error asserting that there is legally insufficient evidence of fraud, but it does not argue in its briefing in this Court that its representations about the project's technological or commercial infeasibility were immaterial, were merely opinion, or were either not knowingly made or not made without knowledge of the truth. *See Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex.1995). Accordingly, we assume, as we must, that Schlumberger misrepresented the project's technological feasibility and commercial viability and that such misrepresentations are actionable as fraudulent inducement.

In this light, Schlumberger asks us to adopt a *per se* rule that the presence of independent legal counsel always precludes a claim that a party fraudulently induced a release. Texas law does not support such a rule.

Texas law favors and encourages voluntary settlements and orderly dispute resolution. However, a release is a contract, and like any other contract, is subject to avoidance on grounds such as fraud or mistake. *See Williams v. Glash*, 789 S.W.2d 261, 264 (Tex.1990); *Dallas Farm Mach. Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233, 236–37 (1957). Yet our early decisions are not entirely consistent. Several of our opinions conclude that a release could be set aside if it was induced by a fraudulent representation or promise—even if the release contained language disclaiming that any such representation had been made. Other cases hold to the contrary.

In *Texas & Pacific Railway Co. v. Presley*, 137 Tex. 232, 152 S.W.2d 1105 (Tex.1941), an injured worker settled his claim against his employer for $50, executing a release providing that he relied upon his own judgment as to the extent and duration of his injuries and that no promise of employment or other agreement not mentioned in the release had been made to him. *Id.* at 1106. The worker later sued to set aside the release, contending that his employer's doctor had misrepresented the extent of his injuries and that the employer had promised him permanent employment for executing the release, with no intention of fulfilling that promise. *See id.* We held that proof of these contentions would be sufficient to set aside the release. *Id.* at 1108. This could be done, we decided, even though the plaintiff may have read and understood the release. *Id.* at 1107.

Similarly, in *Edward Thompson Co. v. Sawyers*, 111 Tex. 374, 234 S.W. 873 (1921), a buyer purchased a set of legal encyclopedias based on the seller's oral promise that it would continue to publish and deliver annual supplements for at least fifteen years. The buyer proved that the seller made this promise with no intention of fulfilling it. We held that this constituted fraud sufficient to set aside the agreement, even though the written contract provided that no representations or guaranties had been made by the seller that were not expressed therein. "Promises made without intention of fulfillment, in order to induce others to make contracts, are as culpable and as harmful as are willful misrepresentations of existing facts. Hence contracts may be avoided alike for such fraudulent promises and for such misrepresentations." *Id.* at 874. We explained that, where a contract is induced by fraud, there is in reality no contract because there is no "real assent" to the agreement. *Id.* Thus, the defrauded party is not bound by any of the contractual provisions, "including those relating to representations or guaranties which induced its execution." *Id.* at 874–75.

There are other early cases, however, that reach the opposite result. For example, in *Distributors Investment Co. v. Patton*, 130 Tex. 449, 110 S.W.2d 47 (Tex.1937), the seller of a tractor sued the buyer on his promissory note. In defense, the buyer contended that the seller had fraudulently induced the transaction by orally misrepresenting the tractor's capabilities. The contract provided that the tractor was sold "as is," and further provided that no other representations had been made. *Id.* at 48. We held that, in light of these contract provisions, an action for rescission could not be maintained on account of oral representations. Although recognizing that "fraud vitiates a contract," we concluded that the fraud must be something more than merely oral representations that conflict with the terms of the written contract. *Id.* Instead, to vitiate the contract, the fraud must be such that it "prevents the coming into existence of any valid contract at all." *Id.*; *see also Avery Co. v. Harrison Co.*, 267 S.W. 254, 256 (Tex. Com. App.1924, judgm't adopted); *J.I. Case Threshing Mach. Co. v. Manes*, 254 S.W. 929, 931 (Tex. Com. App.1923, judgm't adopted); *Wright v. Couch*, 54 S.W.2d 207, 209 (Tex.Civ.App.—Eastland 1932, no writ).

In *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957), we considered whether parol evidence was admissible, despite a merger clause in a written contract, to establish that a contract was induced by fraud. The seller brought suit against the purchaser of a tractor and loader for the balance due on the purchase contract. The buyer counterclaimed for rescission, claiming that he was fraudulently induced to contract by false representations about the work capacities of the tractor and loader. The seller argued that a merger clause providing that the contract was "the entire contract relating to the sale and warranty" of the equipment and that "no warranty is made or authorized to be made other than herein set forth" precluded the buyer's fraudulent inducement claim. *Id.* at 234. In resolving the parties' dispute, we considered the two lines of cases discussed previously and concluded that they represented conflicting lines of authority that could not be distinguished on any principled ground. *See id.* at 238–39. We resolved the conflict by holding, as a matter of policy, that a merger clause can be avoided based on fraud in the inducement and that the parol evidence rule does not bar proof of such fraud. *See id.* at 239. In doing so, we brought the law on the subject "into harmony with the great weight of authority, with the rule of the Restatement of the Law of Contracts, and with the views of eminent text-writers." *Id.* (citations omitted).

Juxtaposed to this authority, we have a competing concern—the ability of parties to fully and finally resolve disputes between them. Parties should be able to bargain for and execute a release barring all further dispute. This principle necessarily contemplates that parties may disclaim reliance on representations. And such a disclaimer, where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim. As an example, a disclaimer of reliance may conclusively negate the element of reliance, which is essential to a fraudulent inducement claim. *See Prudential*, 896 S.W.2d at 161–62 (holding that agreement to buy property "as is," in which buyer included "voluntary, freely negotiated affirmation that he was depending on his own assessment of the building," precluded claim for damages when building was found to contain asbestos); *Estes v. Hartford Accident & Indem. Co.*, 46 S.W.2d 413, 417–18 (Tex.Civ.App.—El Paso 1932, writ ref'd) (affirming directed verdict upholding release where evidence conclusively negated reliance on alleged misrepresentations). The question is under which circumstances such disclaimers are binding.

■ In this case, the Swansons contend that they agreed to Schlumberger's low-price buyout offer only after they were induced by misrepresentations about the value and feasibility of the sea-diamond project. We conclude that our well-established rules of contract interpretation govern whether the Swansons gave the requisite clear and unequivocal expression of intent necessary to disclaim reliance on these specific representations by Schlumberger. The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding. *See Columbia Gas Transmission*

*Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 591 (Tex.1996); *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995); *Prudential,* 896 S.W.2d at 162. Because the parties were attempting· to put an end to their deal, and had become embroiled in a dispute over the feasibility and value of the project, we conclude that the disclaimer of reliance the Swansons gave conclusively negates the element of reliance.

In negotiating the release, highly competent and able legal counsel represented both parties and, as we have said above, the parties were dealing at arm's length. Further, both Schlumberger and the Swansons are knowledgeable and sophisticated business players. The Swansons have been involved in traditional diamond mining in South Africa for several decades. They and Schlumberger, a multinational corporation, were engaged in a business venture involving tens of millions of dollars and in negotiations to sell their interests ultimately for several million dollars.

Significantly, throughout the parties' negotiations, the Swansons disagreed with Schlumberger about the feasibility and value of the sea-diamond project. Schlumberger never convinced the Swansons that DeBeers' offer was a good deal; four days before he signed the release, John Swanson wrote to his attorney that the Swansons' lease interest was "worth billions." The Swansons seriously considered suing Schlumberger even *before* the sale to DeBeers and Seltrust. Indeed, the release states that the Swansons claimed that they had an interest in the mining consortium and in Schlumberger's prospecting lease, and that Schlumberger was "liable to the Swansons in connection with the prospecting or exploration of diamonds or other precious stones or minerals in South Africa." In this connection, the release recites that

> there is considerable doubt, disagreement, dispute and controversy with reference to the validity of the Swansons' claim against [Schlumberger] and as to the legal or moral liability of [Schlumberger] for any amount of damages or justification for legal relief, and there is further doubt, dis-

agreement, uncertainty and confusion as to the amount of said liability, if any.

Further, the Swansons released all "causes of action of whatsoever nature, or any other legal theory arising out of the circumstances described above, from any and all liability damages of any kind known or unknown, whether in contract or tort." The sole purpose of the release was to end the dispute about the value of this commercial project between Schlumberger and the Swansons once and for all.

In this context and in clear language, the Swansons unequivocally disclaimed reliance upon representations by Schlumberger about the project's feasibility and value. They said:

> [E]ach of us [the Swansons] expressly warrants and represents and does hereby state ... and represent ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that **none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us ·is relying on his or her own judgment** and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release .... (emphasis added)

Because courts are to assume that the parties intended every contractual provision to have some meaning, *see Columbia Gas,* 940 S.W.2d at 591; *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996), we must presume that the parties contemplated, by the inclusion of this clause, that the Swansons would not rely on any representations of Schlumberger about the commercial feasibility and value of this project, which, after all, was the very dispute that the release was supposed to resolve. Therefore, we conclude that the disclaimer of reliance is binding and, as a matter of law, precludes the Swansons' claim that they were fraudulently induced to sell their interest in the sea-diamond project.

■ In sum, we hold that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement. We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim. *See Prudential*, 896 S.W.2d at 162 (identifying some circumstances in which "as is" clause would not preclude fraudulent inducement claim). We conclude only that on this record, the disclaimer of reliance conclusively negates as a matter of law the element of reliance on representations about the feasibility and value of the sea-diamond mining project needed to support the Swansons' claim of fraudulent inducement. As there is no evidence of a fiduciary or confidential relationship, the trial court correctly rendered a judgment notwithstanding the verdict against the Swansons on their claims of breach of fiduciary duty and fraudulent inducement.

## IV. COMMON-LAW FRAUD

The Swansons contend that even if the disclaimer of reliance precludes their claim that they were fraudulently induced to sign the release by Schlumberger's affirmative misrepresentations, it does not preclude their claim of fraud by non-disclosure. Under common-law fraud, the Swansons assert, Schlumberger had an affirmative duty to disclose material information about the sea-diamond project because Schlumberger knew that the Swansons did not have an equal opportunity to discover the information, that the Swansons lacked accurate information on the project's value and feasibility, and that the Swansons were relying on this inaccurate information in selling their interests in the project. *See Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979). In addition, the Swansons claim that Schlumberger, having made only partial disclosures that were misleading, had a duty to disclose the whole truth about the value and feasibility of the project. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986). The Swansons contend that Schlumberger withheld geologic, economic, and technical information that would have

permitted the Swansons to make their own assessment of the sea-diamond project. Again, we assume that Schlumberger had a duty to disclose pertinent information and failed to do so.

■ The Swansons assert that the jury's verdict must be sustained because reliance is not an element of a claim for fraud by non-disclosure. We disagree. Reliance is an element of fraud. *See Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977). Fraud by non-disclosure is simply a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts. *See Smith*, 585 S.W.2d at 658.

The Swansons rely on *Johnson*, 120 S.W.2d at 787, in which we said that partners owe each other a duty to make full disclosure of all material facts within their knowledge relating to partnership affairs. Because of that duty, we held that the issue of one partner's reliance on the other to discharge that duty to disclose was immaterial. *Id.* at 788. *Johnson* is not pertinent to our discussion because, as we have said, there is no evidence of a partnership or other confidential relationship between Schlumberger and the Swansons.

■ Even so, the Swansons assert that the disclaimer of reliance is nonetheless immaterial because it does not disclaim reliance on Schlumberger's non-disclosures; it does not say, for example, that "none of us is relying on Schlumberger for accurate reports about the project." Schlumberger responds that the language of the disclaimer of reliance expressly covers claims for both affirmative statements and non-disclosures. In particular, Schlumberger asserts that the alleged non-disclosures are merely the converse of the misrepresentations; the disclaimer of reliance covers any "non-disclosures" that are the equivalent of the representations on which the Swansons disclaimed reliance. We agree with Schlumberger.

In support of their argument, the Swansons reiterate the evidence that in April 1986 Schlumberger had a report that positively

assessed the technological and economic feasibility of the sea-diamond project, yet in 1987 and 1988, after Schlumberger decided to withdraw Sedswan from the joint venture, Schlumberger made statements and disclosures to the Swansons indicating that the technology was unworkable and the project would not be commercially feasible. Had Schlumberger disclosed the geological, economic, and technical data available to it, the Swansons contend that they would have been able to make their own assessment and determine that there had been no adverse developments since April 1986. In short, had Schlumberger disclosed all the true facts about the project, it would not have affirmatively misrepresented the truth. The Swansons' non-disclosure allegations are simply the converse of Schlumberger's affirmative misrepresentations and are covered by the disclaimer of reliance.

## V. SECTION 27.01 OF THE TEXAS BUSINESS & COMMERCE CODE

In addition to finding breach of fiduciary duty and common-law fraud, the jury found that Schlumberger committed fraud in connection with a real estate transaction in violation of section 27.01 of the Texas Business and Commerce Code. TEX. BUS. & COM.CODE § 27.01. Schlumberger contends that section 27.01 does not apply to the Swansons' interest in the sea-diamond project. Schlumberger argues that the Swansons' interest at most was an interest in a prospecting lease off the South African coast, which under both South African and Texas law is a personal property interest, and not an interest in real estate.

We need not consider the choice-of-law and applicability issues Schlumberger raises. Nor do we approve or disapprove of the court of appeals' discussion on the application and construction of section 27.01 in this case. For our purposes, we assume, without deciding, that section 27.01 applies to Schlumberger's purchase of the Swansons' interest. Given that assumption, we hold that the disclaimer of reliance precludes the Swansons' statutory fraud claim.

As with the common law, reliance is a necessary element of a statutory fraud claim under section 27.01. TEX. BUS. & COM.CODE § 27.01(a)(1)(B). As is clear from our previous discussion, the disclaimer of reliance in this case conclusively negates the Swansons' allegation that they relied on misrepresentations about commercial feasibility and value by Schlumberger in selling their interest in the sea-diamond project. The trial court's judgment notwithstanding the verdict was in all respects proper.

\* \* \* \* \* \*

We reverse the judgment of the court of appeals and render judgment that the Swansons take nothing.

OWEN, J., not sitting.