# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-06-00240-CV
---

**Robert Langguth and Claudia L. Langguth, Appellants**

**v.**

**JAT Enterprises, Ltd. and William K. Neils, Appellees**

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-03-000093, HONORABLE DARLENE BYRNE, JUDGE PRESIDING**
---

### M E M O R A N D U M   O P I N I O N

After purchasing the McNeil Car Wash and Lube from appellees JAT Enterprises, Ltd. and William K. Neils, appellants Robert and Claudia L. Langguth sued appellees for common law and statutory fraud, *see* Tex. Bus. & Com. Code Ann. § 27.01 (West 2002), and violations of the Texas Deceptive Trade Practices-Consumer Protection Act. *See id.* §§ 17.41-.63 (West 2002 & Supp. 2006). The trial court granted summary judgment in favor of appellees. On appeal, the Langguths argue that the trial court improperly granted summary judgment because: (1) there was sufficient evidence to create a material fact issue on whether the Langguths relied on financial statements provided by appellees; and (2) the Langguths produced more than a scintilla of evidence to support each of the elements of their fraudulent inducement claim. For the reasons discussed below, we affirm the trial court's judgment.

**FACTS AND PROCEDURAL BACKGROUND**

William K. Neils is the president of the corporate general partner of JAT Enterprises, Ltd. JAT operated the McNeil Car Wash and Lube located in Austin. In March 2001, real estate broker Jim Krebs contacted Neils regarding a potential sale of the business. Krebs informed Neils that he knew of several people who might be interested in purchasing the car wash and lube and asked for permission to try and sell it. Neils agreed.

Thereafter, Krebs encountered Robert Langguth at a commercial real estate brokers meeting. Krebs told Langguth about the McNeil Car Wash and Lube, and Langguth requested financial information so that he could analyze the business for the possibility of purchasing it. Krebs sent nine pages of information about McNeil Car Wash and Lube to Langguth's real estate agent, Barry S. Winkle. Included in this information were three income statements: one for the year ending December 31, 2000; one for the three-month period ending March 31, 2001; and one for the three-month period ending June 30, 2001. Also included was information regarding another car wash that was offered for sale through Krebs and a summary page from an internet marketing service regarding McNeil Car Wash and Lube. Printed at the bottom of the summary page was the following statement:

> This information has been secured from sources we believe to be reliable, but we make no representation or warranties, express or implied, as to the accuracy of the information. All references to age, sq. footage, income, and expenses are approximate. Buyers should conduct their own independent investigations and rely only on those results.

In November 2001, Krebs faxed the Langguths another income statement provided by appellees for the three-month period ending September 30, 2001.

The parties entered into a real estate contract for the Langguths to purchase the McNeil Car Wash and Lube for $1.4 million in December 2001.[1] Section 11 of the contract states:

> 11. PROPERTY CONDITION. Other than provided herein, seller hereby disclaims, and purchaser hereby waives, any and all warranties of any nature regarding the property. Seller has not made and does not make any representations, warranties or covenants of any kind or character whatsoever, whether express or implied, with respect to: the income, expenses, profit, losses or other aspects of the operation of the property; the square footage of the property; the quality or condition of the property; the suitability or safety of the property for any activities and uses which purchaser may conduct thereon; compliance by seller and/or the property with any laws, rules, ordinances, or regulations of any applicable governmental authority, including subdivision and zoning ordinances and building codes; or the habitability, merchantability, or fitness of the property for a particular purpose. . . . [T]he provisions contained in this paragraph shall survive delivery of the deed. Purchaser shall accept the property "as is", "where is", and with all faults. Purchaser shall make its own independent inspection of all aspects of the property and shall have no recourse whatsoever against seller in the event of discovery of any defects of any kind, latent or patent.[2]

Section 11 continues:

> The Warranty Deed by which Seller conveys title to the Purchaser shall contain appropriate "as is" language, similar to the language above. The Warranty Deed will also provide that Seller's limitation of warranties and Purchaser's waiver of warranties shall survive closing.

---

[1] The record reflects that only Robert Langguth, and not Claudia, signed the purchase contract.

[2] In the original contract, this paragraph of section 11 was typed in all capitalized letters.

The contract also provided Langguth with a 45-day period in which to conduct his investigation and inspection of the property. In relevant part, section 6 of the contract states:

> 6.    FEASIBILITY PERIOD. For a period of forty five (45) days after the Effective Date (the "Feasibility Period"), Purchaser shall have the right of investigation and inspection of the Property to determine whether or not Purchaser desires to proceed with the purchase of the Property. . . . If Purchaser determines, in Purchaser's sole judgment and discretion, that the Property is not suitable for Purchaser's intended use, Purchaser shall give Seller written notice of such fact on or before the end of the Feasibility Period. Within five days of receipt of such written notice, Seller shall instruct the Escrow Agent to refund the Escrow Deposit to Purchaser, and both parties shall be released from all further obligations under this Contract.

After the 45-day due diligence period expired, the parties agreed to extend the closing to allow Langguth more time to obtain financing.

The record reflects that, prior to signing this contract, Langguth had extensive experience buying and selling real estate and businesses. Langguth had acquired other real property under terms similar to those provided in the contract at issue here. He had previously purchased ongoing businesses, including a book store and a homebuilding company. The record also reflects that Langguth had experience assessing the value of business operations and analyzing business financial statements. Langguth further represented to Krebs that he was a businessman who had bought and sold many companies.

It is undisputed that Langguth was represented by competent and able counsel throughout the transaction. After appellees proposed the initial form of the contract, Langguth and his attorney reviewed the draft and requested several changes, all of which were incorporated into

4

the final contract. Langguth agreed that the final executed contract "contained everything in it" that Langguth and his attorney wanted.

Eight months after closing, the Langguths sued appellees asserting claims of common law and statutory fraud and DTPA violations. Appellees moved for summary judgment on the ground that the Langguths failed to establish a genuine issue of material fact because they were barred as a matter of law from relying on any representations made by appellees prior to December 14, 2001, based on the express disclaimer of reliance in the contract. *See* Tex. R. Civ. P. 166a(c). Appellees also moved for a no-evidence summary judgment on the ground that the Langguths provided no evidence to support three elements of their fraudulent inducement claim. *See* Tex. R. Civ. P. 166a(i). The trial court granted both of appellees' motions for summary judgment.

## ANALYSIS

In two issues, the Langguths appeal the trial court's grant of summary judgment in favor of appellees.[3] First, the Langguths assert that the trial court erred in granting appellees' motion for summary judgment because there was a material issue of fact on whether the Langguths relied on appellees' representations. Second, the Langguths assert that the trial court erred in granting appellees' no-evidence motion for summary judgment because the Langguths produced sufficient evidence to create a genuine issue of material fact on the challenged elements of their fraudulent inducement claim.

---

[3] The Langguths appeal only from the trial court's grant of summary judgment on their fraud claims. They do not appeal the grant of summary judgment on their claim alleging DTPA violations.

5

### Standard of Review

We review the trial court's decision to grant summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Appellees moved for summary judgment on both no-evidence and rule 166a(c) summary judgment grounds; however, because we conclude that appellees satisfied the burden for summary judgment under rule 166a(c), we discuss only that standard of review. To prevail on a summary judgment motion, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). In deciding whether there is a disputed material fact issue precluding summary judgment, we must take evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

### Reliance

In their first issue, the Langguths contend that the trial court erred in granting summary judgment because there was a genuine issue of material fact regarding whether the Langguths relied on appellees' representations made prior to entering the contract. Appellees counter that the Langguths agreed to purchase the car wash and lube "as is" and expressly disclaimed reliance on any representations made by appellees prior to signing the contract on December 14, 2001.

As a general rule, Texas law provides that an "as is" agreement negates the causation essential to recovery on claims of DTPA violations, fraud, and negligence. *See Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 161-62 (Tex. 1995). However, "[a] buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller." *Id.* at 162. To determine whether an "as is" agreement is enforceable, a reviewing court must consider "the nature of the transaction and the totality of the circumstances surrounding the agreement." *Id.* Where an "as is" clause is included as an important part of the basis of the bargain and not as an incidental or "boiler-plate" provision, and the contract is entered into by parties of relatively equal bargaining power, a buyer's declaration and agreement that he is not relying on representations of the seller should be upheld. *Id.*

An important principle of Texas contract law allows a party to disclaim reliance on representations. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997). Moreover, even in the face of a fraudulent inducement claim, courts will uphold such a disclaimer where the party's intent is clear and specific. *Id.*

In this case, the Langguths contend that they agreed to purchase the McNeil Car Wash and Lube only after they were induced by misrepresentations about the average monthly revenue and income of the business. As part of the contract, however, the Langguths expressly disclaimed reliance on any representations made by appellees prior to signing the contract. We must examine the contract and the circumstances surrounding its formation to determine whether this disclaimer is binding. *See id.* at 180. We conclude that the well-established rules of contract interpretation

7

govern whether the Langguths "gave the requisite clear and unequivocal expression of intent necessary to disclaim reliance on these specific representations" by the appellees. *See id.* at 179.

Here, as in *Schlumberger*, both parties to the agreement were sophisticated business persons and possessed relatively equal bargaining power. The record reflects that Mr. Langguth had extensive experience buying and selling real estate. He had previously purchased commercial real estate as well as ongoing commercial businesses. Mr. Langguth had experience evaluating business financial statements and assessing the value of business operations, and the summary judgment evidence shows that he had purchased real estate under terms similar to those at issue here. The Langguths were represented by counsel throughout the transaction, and all of the Langguths' requested changes were incorporated into the final contract.

Section 6 of the contract provided the Langguths with an opportunity to conduct their own due diligence investigation before becoming bound to complete the purchase. Had the Langguths been dissatisfied within the due diligence period, the contract allowed them to walk away without any obligation to appellees. The record reflects that, although they requested an extension of the due diligence period, the Langguths ultimately agreed to complete the purchase without the extension.

In section 11 of the contract, the Langguths expressly acknowledged and agreed that "seller has not made and does not make any representations, warranties or covenants of any kind or character whatsoever, whether express or implied, with respect to: the income, expenses, profit, losses or other aspects of the operation of the property." The Langguths further agreed in section 11 that they would rely exclusively on their own investigation and assessment of the

8

purchase: "Purchaser shall make its own independent inspection of all aspects of the property and shall have no recourse whatsoever against seller in the event of discovery of any defects of any kind, latent or patent."[4]

By the inclusion of the clear language of this section in the final contract, we conclude the Langguths unequivocally disclaimed reliance upon any representations by appellees regarding the income and revenue of the car wash and lube. The record reflects that the Langguths could have requested appellees to modify this contract provision. Although the Langguths did request changes to the contract, they did not request modification of this provision.

Because courts are to assume that the parties intended every contractual provision to have some meaning, we must presume that, by their inclusion of section 11, the parties contemplated that the Langguths would not rely upon any representations made by appellees regarding the income and revenue of the car wash and lube. *See id.* at 180. Although we recognize that such a disclaimer will not always bar a claim of fraudulent inducement with respect to the disclaimer itself, we conclude that, on this record, the disclaimer of reliance in section 11 conclusively negates as a matter of law the element of reliance on representations about the income and revenue of the car wash and lube needed to support the Langguths' claim of fraudulent inducement. *See id.* at 181. Accordingly, we overrule the Langguths' first issue, and we conclude that the trial court

---

[4] In the original contract, these two quoted provisions of section 11 were typed in all capitalized letters.

9

properly granted appellees' motion for summary judgment under rule 166a(c). Because we conclude the trial court properly granted summary judgment under rule 166a(c), we do not reach the Langguths' second issue.

## CONCLUSION

Having overruled the Langguths' issue on appeal, we affirm the judgment of the trial court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   February 6, 2007