James T. Worthen, Chief Justice
International Business Machines Corporation (IBM) appeals the trial court's judgment in favor of Lufkin Industries, Inc. (Lufkin). IBM raises five issues on appeal, and Lufkin raises a conditional cross-issue in its response brief and a separate cross-appeal. We affirm in part, reverse and render in part, and suggest a remittitur of a portion of the damages awarded in the trial court's judgment incorporating the jury verdict.
BACKGROUND
Lufkin is a NASDAQ traded company that is an industry leader in manufacturing "engineered-to-order" power transmission gear boxes and "manufactured-to-order" oil field pumping units.[1] Its sales of both dropped in the Great Recession of 2007-2008. However, it expected a strong market recovery for both of these products, particularly due to the "fracking" and horizontal drilling revolution throughout Texas, North Dakota, and other states.
To position itself for growth, Lufkin's leadership realized it needed to replace its highly configured but increasingly outdated Enterprise Resources Planning (ERP) System. An ERP system is a computer software business operating system that integrates all departments and functions *22 across the company. Because of the high demand expected for Lufkin's two signature products, as the economy improved, time was of the essence to install a new ERP operating system. Lufkin's executive team had experienced the installation of new business operating systems, both at Lufkin and at other companies, that had taken more time than expected. These delays negatively impacted company earnings.
IBM, through its hardware division, learned of Lufkin's concerns about a lengthy and delay-riddled implementation of a new ERP operating system. David Bisker, an IBM salesman, contacted Lufkin executives, and at his behest, representatives of the two companies began discussions about IBM's Express Solution.[2] IBM designed its Express Solution in 2006 and 2007 with a team of engineers under the direction of Juan Gonzalez, an IBM employee who implements SAP operating systems for small companies.
On September 30, 2009, Gonzalez, on behalf of IBM but with the assistance of SAP, demonstrated software that IBM represented showed the functionality of IBM's Express Solution. Furthermore, IBM represented that its Express Solution was preconfigured in a way to manage both of Lufkin's vastly different product lines-its engineered-to-order transmission gear boxes and manufactured-to-order oil field pumping units. Additionally, IBM represented that its Express Solution would generate financial results for all of Lufkin's required reports, both for U.S. and international plants. After IBM represented that these vital functions required by Lufkin were already preconfigured in the Express Solution, Lufkin agreed to execute a contract, formally called the "Statement of Work" (SOW), with IBM on March 25, 2010.
The SOW projected the implementation would be completed by March 1, 2011, when Lufkin would be able to "Go-Live" with its fully implemented IBM Express Solution. However, the first test of the system in November 2010 was a complete failure. The second test in February 2011 also failed. IBM requested a Project Change Request (PCR) extending the "Go-Live" date to June 1, 2011, along with an increase of its implementation fees by 2.6 million dollars. Lufkin's President, Jay Glick, became concerned "that the project was off the rails." IBM even fired its project manager, William Berry, in early 2011. Nevertheless, IBM continued to insist that it could complete the project if only given more time and money. IBM failed to inform Lufkin that it stopped marketing the Express Solution in the U.S. at the end of 2010.
The June 1, 2011 "Go-Live" date passed without an operational system. Later in June, IBM requested another PCR which added over four million dollars to its fees. IBM assured Lufkin that this would allow it to properly complete the implementation for a January 1, 2012 "Go-Live" date. In September 2011, IBM's third test failed with many of the same problems from the previous two tests continuing to recur. A fourth test in November 2011 also went poorly. By the end of 2011, Lufkin had executed nine PCRs and paid $12,983,736 for IBM's Express Solution. As the January 1, 2012 "Go-Live" date approached, Lufkin sought assurances from IBM that the Express Solution would properly function. IBM promised Glick that although it would be a "Go-Live Ugly and that things *23 might be a little rockier in a few places than a normal startup," IBM had thoroughly tested the payroll system and that it would correctly function. Glick decided to deactivate Lufkin's operating system and to initiate IBM's Express Solution on January 1, 2012.
The "Go-Live Ugly" was likewise unsuccessful. Lufkin was forced to manually calculate payroll amounts because the Express Solution did not function properly. Lufkin's employees were upset and company morale sank. Moreover, the vendor payment system failed, requiring Lufkin to manually make payments to vendors. Likewise, project materials were not delivered to the appropriate machine on a timely basis, and Lufkin's products were not able to be shipped as scheduled and promised. The company had to mostly operate manually during most of the first half of 2012.
The problems extended to financial reporting. As a publicly traded stock on the NASDAQ stock exchange, Lufkin released quarterly reports every three months. With the IBM Express Solution unable to run its business operation system, Lufkin was unable to close its books for January, February, and March of 2012. Lufkin, as a publicly-traded company, was required to report the failed IBM Express Solution implementation and the resultant problems to the public. Lufkin's stock price suffered. Glick reported that the financial situation for the second quarter of 2012 was "similarly bad." Lufkin's stock price continued to be adversely affected.
In the summer of 2012, after six months of a virtually nonfunctioning Express Solution, Lufkin invited IBM and SAP to assess what needed to be done to implement an effective operating system for Lufkin. IBM sent one person who did not have authority to take any action. SAP, on the other hand, began analyzing what could be done to reconfigure the Express Solution so that its software would become operable for Lufkin. With SAP's help, along with other third party consultants, Lufkin was eventually able to develop an operating system after a year and a half of effort. Lufkin continues using this system today. After the disastrous "Go-Live Ugly" Express Solution implementation on January 1, 2012, Lufkin paid third-party consultants an additional $7,544,545.
After implementing an effective business operating system, with the assistance of SAP and third-party contractors, Lufkin sued IBM for, among numerous causes of action, fraudulent inducement of a contract, fraud, and breach of contract. IBM filed a motion for summary judgment, claiming that Lufkin agreed to disclaim its reliance on IBM's representations made prior to signing the SOW, and consequently, Lufkin could not establish the reliance element of the fraudulent inducement and fraud claims as a matter of law.
The trial court denied IBM's motion, and the case proceeded to a jury trial. The jury first determined that IBM fraudulently induced Lufkin to execute the SOW, as modified by the PCRs. It further determined that IBM committed fraud against Lufkin and made a negligent misrepresentation on which Lufkin justifiably relied. The jury also found Lufkin had not waived or ratified IBM's fraudulent acts and it was not estopped from asserting its fraud claims. Furthermore, the jury determined that IBM breached the contract by failing to comply with the SOW, as modified by the nine PCRs.
The jury found that Lufkin had suffered ten million dollars in out-of-pocket damages, which represented the difference in the value of IBM's Express Solution and the amount Lufkin paid for it. The jury also found Lufkin incurred eleven million dollars in "reasonable and necessary expenses incurred in attempting to restore *24 operation of Lufkin's software." On Lufkin's fraud claim, the jury awarded six million dollars. Although the jury determined IBM made negligent misrepresentations and breached the SOW, it found no damages for Lufkin on either cause of action. The jury also declined to award exemplary damages against IBM.
The trial court entered a judgment in favor of Lufkin against IBM for $23,776,025.10, which was based on twenty-one million dollars in out-of-pocket and mitigation damages for Lufkin's fraudulent inducement claim, and $2,776,025.10 in prejudgment interest.[3] IBM timely appealed.
FRAUDULENT INDUCEMENT
In its first issue, IBM challenges the jury's finding of fraudulent inducement, and argues that a provision in the SOW disclaiming reliance on representations it made to Lufkin conclusively negates fraudulent inducement's reliance element.
Standard of Review
In considering a legal sufficiency challenge, we review all the evidence in the light most favorable to the trial court's judgment and indulge every reasonable inference in its favor. City of Keller v. Wilson , 168 S.W.3d 802, 822 (Tex. 2005). We credit any favorable evidence if a reasonable factfinder could and disregard any contrary evidence unless a reasonable factfinder could not. Id. at 821-22, 827. We may only sustain a legal sufficiency challenge when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the sole evidence offered to prove a vital fact, (3) the sole evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. Id. at 810. More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair minded jurors to differ in their conclusions. Wal-Mart Stores, Inc. v. Spates , 186 S.W.3d 566, 568 (Tex. 2006) (per curiam); Forbes Inc. v. Granada Biosciences, Inc. , 124 S.W.3d 167, 172 (Tex. 2003).
In reviewing a factual sufficiency challenge, we consider all of the evidence and uphold the finding unless it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). But factfinders are the sole judges of the credibility of the witnesses and the weight to give their testimony. Wilson , 168 S.W.3d at 819. They may choose to believe one witness and disbelieve another. Id. If the evidence at trial would enable reasonable minds to differ in their conclusions, we will not substitute our judgment, so long as the evidence falls within the zone of reasonable disagreement. Id. at 822.
Applicable Law
Fraudulent inducement is a particular species of fraud that arises only in the context of a contract. Nat'l Prop. Holdings v. Westergren , 453 S.W.3d 419, 423 (Tex. 2015). A party asserting that it was fraudulently induced into entering into a contract must show that (1) the other party made a material representation, (2) the representation was false and was either *25 known to be false when made or made without knowledge of the truth, (3) the representation was intended to be and was relied upon by the injured party, and (4) the injury complained of was caused by the reliance. In re Int'l Profit Assocs., Inc. , 274 S.W.3d 672, 678 (Tex. 2009).
The enforceability of a reliance disclaimer is a question of law. Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am. , 341 S.W.3d 323, 333 (Tex. 2011) (citing Schlumberger Tech. Corp. v. Swanson , 959 S.W.2d 171, 181 (Tex. 1997) ). The Texas Supreme Court has declined to adopt a per se rule that a disclaimer automatically precludes a fraudulent inducement claim. See Forest Oil Corp. v. McAllen , 268 S.W.3d 51, 61 (Tex. 2008).
Our analysis of the parties' intent begins with the contract's express language, and we consider the entire agreement. Italian Cowboy Partners , 341 S.W.3d at 333. To disclaim reliance, the parties must use clear and unequivocal language. Id. at 336 (citing Forest Oil Corp ., 268 S.W.3d at 62 ; Swanson , 959 S.W.2d at 179-80 ). This elevated requirement of precise language helps ensure that parties to a contract-even sophisticated parties represented by able attorneys-understand that the contract's terms disclaim reliance such that the contract may be binding even if it was induced by fraud. Id.
The Texas Supreme Court has further stated that it has a clear desire to protect parties from unintentionally waiving claims for fraud, but also identified "the competing concern-the ability of parties to fully and finally resolve disputes between them." Id . at 332 (quoting Swanson , 959 S.W.2d at 179 ). A disclaimer included in an agreement at the initiation of a business relationship should be all the more clear and unequivocal to effectively disclaim reliance and preclude a claim for fraudulent inducement, lest we "forgive intentional lies regardless of context." Id. at 335 (quoting Forest Oil Corp. , 268 S.W.3d at 61 ). In such a case, "to refuse relief [by enforcing the disclaimer] would result in opening the door for a multitude of frauds and in thwarting the general policy of the law." Id. at 332 (quoting Dallas Farm Mach. Co. v. Reaves , 158 Tex. 1, 307 S.W.2d 233, 239 (1957) ).
It is only after we determine that the contract clearly and unequivocally disclaims the complaining party's reliance on representations that we proceed to examine the other circumstances surrounding the contract's formation and analyze the Forest Oil factors, such as whether the parties: (1) negotiated the terms of the contract rather than simply included boilerplate language, (2) specifically discussed the issue which became the topic of the subsequent dispute, and (3) were represented by counsel, experienced in business matters, and dealing with each other in an arm's length transaction. See ids="2255825,10165126" index="23" url="https://cite.case.law/sw2d/307/233/">id. at 337, n.8 (citing Forest Oil , 268 S.W.3d at 60 ).
Fraudulent Inducement
On September 30, 2009, IBM presented to Lufkin a version of SAP software that was already highly configured, representing that it was IBM's Express Solution. This was the only implementation system that IBM discussed with Lufkin before signing the SOW. IBM represented to Lufkin that its Express Solution was already eighty percent preconfigured and would need only about twenty percent customization. Thus, according to IBM, Lufkin would have a new business operating system without spending an inordinate amount of time implementing the software. However, Gonzalez, in a November 4, 2009 email to the IBM sales representatives negotiating the transaction, warned that *26 the functionality Lufkin wanted would need significant configuration and customization. For example, Gonzalez knew that the Express Solution was created only for approximately thirty users. Lufkin had 650 users. Gonzalez also knew that the Express Solution was intended and designed for a company with one company code. Lufkin had nine company codes. He testified that the Express Solution was intended and designed for the operation of two plants. Lufkin had fifty-six plants.
Berry testified that the Express Solution implementation for many companies, including Lufkin, was likely "doomed to fail from signature." He testified that IBM's strategy was to secure a contract and hope that its implementation team would figure out the details later.
Soon after the parties signed the SOW, IBM implementation engineers told Lufkin that the Express Solution did not have the enhanced functionality and configuration that had been represented and that it would need much more extensive customization than twenty percent. When Lufkin management brought these concerns to IBM management, they were continually reassured to have patience and trust IBM's process because its personnel "were the experts." Even after each integration test cycle (ITC) failure and subsequent "Go-Live" extension date, IBM continued to ensure Lufkin that it would eventually deliver an Express Solution system that would be capable of operating the SAP software and conducting Lufkin's business functions. Lufkin determined that it had no choice but to go forward and trust IBM because to start over would have been both cost and time prohibitive. When the parties initiated the "Go-Live," Lufkin switched from its existing business operating system to the Express Solution, but the new system could perform only ten percent of what IBM had promised. Unable to simply reinstitute its prior system, the Express Solution implementation failure required Lufkin to manually conduct its financial and manufacturing processes. In mid-2012, after Lufkin looked to begin an effective implementation of the SAP platform, IBM ceased to provide substantive support in correcting the system's problems. This forced Lufkin to work with SAP and third-party contractors to develop the business system, which it currently uses, over the next year and a half.
IBM materially misrepresented the functionality of its Express Solution. Gonzalez's email to the IBM sales team and other executives established that IBM knew that the representations regarding the Express Solution that it made to Lufkin were false. IBM knew that the key to obtaining a contract with Lufkin, as explained by Berry, was that Express Solution would be installed quickly. Further, IBM knew they could make the sale to Lufkin with the representation that the Express Solution would be installed quickly because it was eighty percent preconfigured and did not require time consuming and expensive customization. The record shows that Lufkin relied upon these representations by IBM. Finally, the failed implementation of IBM's Express Solution following the January 1, 2012 "Go-Live Ugly" forced Lufkin to virtually operate without a business operating system for six months, and then up to another year and a half before a workable configuration for the SAP software could be implemented.
Accordingly, viewing all the evidence in the light most favorable to the verdict, we hold that the evidence is legally sufficient to support the jury's finding that IBM fraudulently induced Lufkin to execute the SOW on March 25, 2010. See Wilson , 168 S.W.3d at 822. Such a finding is not so against the overwhelming weight of the *27 evidence as to be clearly wrong and unjust. See Cain , 709 S.W.2d at 176.
Disclaimer of Reliance Provisions
Also as part of its first issue, IBM contends that Lufkin made disclaimers in the SOW that bar its claims of fraudulent inducement and fraud. It specifically argues that the following statement on page eight of the SOW precludes the reliance element required for either fraudulent inducement or fraud:
In entering into this SOW, Lufkin Industries is not relying upon any representation made by or on behalf of IBM that is not specified in the Agreement or this SOW, including without limitation, the actual or estimated completion date, amount of hours to provide any of the Services, charges to be paid, or the results of any of the Services to be provided under the SOW. This SOW, its Appendices, and the Agreement represent the entire agreement between the parties regarding the subject matter and replace any prior oral or written communications.
IBM also contends that the following statement on the signature page of the SOW is another disclaimer of reliance by Lufkin:
This SOW and the referenced Agreement identified below, are the complete agreement between Lufkin Industries and IBM regarding Services, and replace any prior oral or written communications between us. Accordingly, in entering into this SOW, neither party is relying upon any representation that is not specified in this SOW including without limitation, any representations concerning 1) estimated completion dates, hours, or charges to provide any Service; 2) the experiences of other customers; or 3) results or savings Lufkin Industries may achieve.
Lufkin responds that these disclaimers apply only to representations that were not a part of the SOW. It argues that the representations it relied upon were contemplated by the parties and incorporated within the SOW and therefore do not trigger the disclaimer provisions. Specifically, Lufkin relies on the following two sentences of the first paragraph of the SOW:
We also recognize the effort Lufkin Industries' staff has experienced over the past several months interacting with IBM to share information about the goals and objective of this project, current business processes and supporting systems. This exchange is the basis of our understanding for this proposal.
Texas has a clear interest in protecting parties from unintentionally waiving a claim for fraudulent inducement. See Italian Cowboy Partners , 341 S.W.3d at 332. This public policy "that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices." Reaves , 307 S.W.2d at 239. This is particularly so at the initiation of a business relationship. See Italian Cowboy Partners , 341 S.W.3d at 335. However, we must also consider the competing concern of parties being able to fully and finally resolve disputes that may arise between them, even though the disclaimer here was interjected at the beginning of a business relationship rather than contemplated by the parties during an attempt to end a failed relationship. See Swanson , 959 S.W.2d at 179.
First, when viewing the disclaimer provision and the signature page in isolation, Lufkin disclaimed reliance upon any representation not specified within the SOW. However, when viewing the SOW as a whole, as we must, the provision on the first page states that the exchange of information over the months preceding the *28 SOW forms the basis of the parties' understanding for IBM's offer to Lufkin. That exchange of information necessarily includes the representations made by IBM during the sales process, including its sales presentations, which are the same representations IBM argues that the reliance disclaimer provisions purport to negate. Accordingly, because of this ambiguity, we cannot conclude that the contract clearly and unequivocally disclaimed Lufkin's reliance on IBM's representations that form the basis of its fraudulent inducement claims. Therefore, we need not examine the remaining Forest Oil factors. See Italian Cowboy Partners , 341 S.W.3d at 337 n.8 (stating that clear and unequivocal analysis is a threshold determination) (citing Forest Oil , 268 S.W.3d at 60 ).
Alternatively, in accordance with Lufkin's argument, even if we were to conclude that the disclaimer and the signature page of the SOW are clear and unequivocal and otherwise valid and enforceable under the Forest Oil factors, the disclaimers were not invoked here. This is because under their terms, Lufkin did not disclaim reliance on representations "specified in the SOW." The provision in the first paragraph of the SOW is "specified in the SOW." That paragraph of the SOW specifically states that the exchange of information between Lufkin and IBM was the basis of the offer IBM made to Lufkin. IBM's representations concerning its Express Solution, as presented by IBM during the sales process, is part of the information exchanged between IBM and Lufkin. Consequently, the exchange of information, being the basis of IBM's offer, is "specified" and incorporated into the SOW, and Lufkin did not disclaim reliance on the substance of that information.
As part of this analysis, we note that in contrast to the disclaimer on the signature page of the SOW, in which both parties disclaimed reliance on representations outside the SOW, IBM is not included within the disclaimer found on page eight of the SOW. This is because IBM relied upon the exchange of information to make its offer. But for there to be a meeting of the minds required to make the SOW a valid contract, both parties had to be relying upon the exchange of information.[4]
Moreover, the disclaimers provide a non-exclusive laundry list of representations upon which Lufkin may not rely. However, the laundry list's applicability is conditioned upon the representation being unspecified within the SOW. As we have concluded, the representations made as part of the exchange of information forming the basis of Lufkin's claims have been incorporated within the SOW.
Accordingly, we hold that the contractual language did not clearly and unequivocally disclaim Lufkin's reliance on IBM's representations, and in any event, the representations forming the basis of Lufkin's claim did not trigger the reliance disclaimer provisions. Therefore, the disclaimers do not bar Lufkin's fraudulent inducement claim. See *29 Italian Cowboy Partners , 341 S.W.3d at 335 ; see also Reaves , 307 S.W.2d at 239.
IBM's first issue is overruled.
S AFFIRMATIVE DEFENSES IBM'
In its second issue, IBM argues that the evidence conclusively shows that Lufkin ratified IBM's actions and that Lufkin waived its fraudulent inducement claim. As part of this issue, IBM further alleges that Lufkin should be estopped from recovering damages for fraudulent inducement.
Standard of Review
Ratification, waiver, and quasi-estoppel are affirmative defenses that must be pleaded and proved by the party asserting them. See TEX. R. CIV . P. 94 (expressly stating waiver and estoppel are affirmative defenses); Italian Cowboy Partners , 341 S.W.3d at 344 (stating that ratification and waiver are affirmative defenses); Lopez v. Munoz, Hockema & Reed, L.L.P. , 22 S.W.3d 857, 864 (Tex. 2000) (noting that quasi-estoppel is an affirmative defense). A defendant challenging the jury's adverse finding on its affirmative defense must show that it conclusively established all vital facts in support of the defense. See Dow Chem. Co. v. Francis , 46 S.W.3d 237, 241 (Tex. 2001).
It is the province of the jury to resolve conflicts in the evidence. Wilson , 168 S.W.3d at 820. Accordingly, courts reviewing all of the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict. Id . A reviewing court cannot substitute its judgment for that of the factfinder, so long as the evidence falls within a zone of reasonable disagreement. Id . at 822. If some evidence supports the verdict, then the contrary evidence was not undisputed, or conclusive. See id . at 815. While ratification and waiver are normally considered questions of fact, they may become questions of law if the facts and circumstances are clearly established. See Ostrowski v. Ivanhoe Prop. Owners Improvement Ass'n, Inc. , 38 S.W.3d 248, 255 (Tex. App.-Texarkana 2001, pet. denied).
Applicable Law
The elements of ratification are: (1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intent to validate the earlier act. Neese v. Lyon , 479 S.W.3d 368, 384 (Tex. App-Dallas 2015, no pet.). A party ratifies an agreement when-after learning all of the material facts-it confirms or adopts an earlier act that did not then legally bind it and that it could have repudiated. Id .
Waiver is defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. Jernigan v. Langley , 111 S.W.3d 153, 156 (Tex. 2003). There must be full knowledge of the known right and there must be an intentional relinquishment of the known right. Ostrowski , 38 S.W.3d at 255.
Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. Lopez , 22 S.W.3d at 864. The doctrine applies when it would be unconscionable for a party to maintain a position inconsistent with one to which it acquiesced, or from which it accepted a benefit. Id .
Discussion
The trial court submitted a broad form question regarding IBM's affirmative defenses in its jury charge, asking whether Lufkin waived its fraudulent inducement claim, ratified IBM's actions found to constitute fraudulent inducement, and is estopped from asserting its fraudulent inducement claim. The jury replied, "No."
*30 IBM contends that Lufkin's Chief Financial Officer Chris Boone recognized that the Express Solution did not conform to IBM's representations in June 2010, and would require extensive customization, yet continued with its implementation. IBM argues that Lufkin's decision to continue the implementation process conclusively shows that Lufkin ratified IBM's actions, or that Lufkin waived or should be estopped from asserting its fraudulent inducement claim.
According to Lufkin, when Boone raised this concern, Berry and Anuj Saxena, one of the lead salespersons, assured him that the Express Solution would deliver as promised. They both told Boone that he did not yet fully understand how the Express Solution worked. They explained that although the Express Solution did not appear to function properly at that particular stage of the implementation, Lufkin should wait until IBM finished the configuration to understand how it worked. Berry and Saxena urged Lufkin to maintain patience and trust IBM's process.
Under the procedural posture of this case, IBM was required to conclusively prove that Lufkin had full knowledge of the material facts related to IBM's deception, yet decided to intentionally approve the act and continue the implementation process. See Dow Chem. Co. , 46 S.W.3d at 241 (describing IBM's burden) ; see also Neese , 479 S.W.3d at 384 (explaining ratification elements). Upon learning of the problems with the implementation process in June 2010, Boone believed IBM's sales team was either incompetent or that IBM might have acted fraudulently during the sales process. When Boone confronted IBM, Berry and Saxena convinced him that he needed to be patient and give the Express Solution implementation more time. Based upon their representation that the implementation would eventually be successful, he and Lufkin continued forward. Apparently, he only thought IBM might have acted fraudulently, but was convinced otherwise by Berry and Saxena. The truth was that the Express Solution implementation was rife with problems and it would not properly function as represented to meet Lufkin's needs. Thus, IBM has not conclusively proved that Lufkin and its agents, such as Boone, approved IBM's actions with "full knowledge" of the facts, an essential element of ratification. See ids="6822905" index="46" url="https://cite.case.law/sw3d/479/368/#p384">id.
Similarly, waiver requires full knowledge of the known right and yet the party intentionally relinquishes it. See Ostrowski , 38 S.W.3d at 255. Because the jury could have reasonably concluded that Boone did not have full knowledge of the material facts when Lufkin decided to proceed with the implementation, IBM failed to conclusively establish its waiver defense. See ids="11121524" index="48" url="https://cite.case.law/sw3d/38/248/#p255">id.
Finally, IBM contends that Lufkin allowed the implementation of the Express Solution to go forward even though it was concerned that it did not have the proper configuration. IBM argues this was an acceptance of the benefits of the SOW, a form of quasi-estoppel. Lufkin contends that it did not have full knowledge of the Express Solution when it authorized any implementation to continue after its earlier concerns. Before the acceptance of benefits can trigger estoppel, it must be shown that the benefits were accepted with knowledge of all material facts. See Nash v. Beckett , 365 S.W.3d 131, 144 (Tex. App.-Texarkana 2012, pet. denied). While IBM's Berry and Saxena had full knowledge of the Express Solution and its problems, Lufkin's Boone did not. It was within the jury's province as factfinder to determine the estoppel question as it did, and IBM has failed to conclusively establish its quasi-estoppel *31 defense. See ids="7314475" index="50" url="https://cite.case.law/sw3d/365/131/#p144">id. ; see also Wilson , 168 S.W.3d at 820.
IBM's second issue is overruled.
FRAUD
IBM argues in its third issue that Lufkin's fraud claim is barred by the economic loss rule because it seeks to recover economic losses arising out of the subject matter of the SOW, which are the same losses it sought redress from in its breach of contract claim. As part of its argument, IBM argues that Lufkin's fraud claim is subsumed within its fraudulent inducement claim. IBM contends in its fourth issue that the trial court erred when it rendered an alternative judgment on Lufkin's fraud claim for six million dollars. Lufkin filed a cross-appeal alleging that the trial court erred in refusing to award damages of six million dollars for fraud in its judgment, in addition to the twenty-one million dollars in damages for the fraudulent inducement claim. Because these issues are related, we address them together.
Standard of Review and Applicable Law
The applicability of the economic loss rule is a legal question that we review de novo. James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc. , 403 S.W.3d 360, 365 (Tex. App.-Houston [1st Dist.] 2013, no pet.).
Under the economic loss rule, a duty in tort generally does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim. Dewayne Rogers Logging v. Propac Indus., Ltd. , 299 S.W.3d 374, 382 (Tex. App.-Tyler 2009, pet. denied). When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract. See Sw. Bell Tel. Co. v. DeLanney , 809 S.W.2d 493, 494 (Tex. 1991) (declining to recognize negligent failure to perform contract claim and tort damages when duty to perform created solely by contract).
To determine whether the economic loss rule applies, we consider the source of the defendant's duty to act, particularly whether it arose solely out of the contract or from some common law duty. Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc. , 960 S.W.2d 41, 45 (Tex. 1998). For example, Texas law has long imposed a legal duty to refrain from fraudulently inducing a party to enter into a contract, independent of any duties imposed by contract. Sharyland Water Supply Corp. v. City of Alton , 354 S.W.3d 407, 417-19 (Tex. 2011) (stating that tort causes of action and damages are available in certain classes of cases, such as fraudulent inducement, even in presence of purely economic losses where duty is imposed by law rather than created by contract) (citing Formosa Plastics Corp. , 960 S.W.2d at 46 ). Consequently, the economic loss rule does not bar a fraudulent inducement claim. See ids="11870306" index="58" url="https://cite.case.law/sw2d/960/41/#p45">id.
We also consider the nature of the injury and the remedy sought by the plaintiff. Formosa Plastics Corp. , 960 S.W.2d at 45. Under the economic loss rule, the plaintiff may not bring a tort claim unless the plaintiff can establish that he suffered an injury that is distinct, separate and independent from the economic losses recoverable under a breach of contract claim. See Sterling Chems., Inc. v. Texaco, Inc ., 259 S.W.3d 793, 797 (Tex. App.-Houston [1st Dist.] 2007, pet. denied). An exception allows a plaintiff to bring a claim for fraudulent inducement to enter into a contract without a showing of an injury distinct from permissible contract damages. Id . at 798.
The one-satisfaction rule prohibits a plaintiff from recovering more than once for a single injury.
*32 Tony Gullo Motors I, L.P. v. Chapa , 212 S.W.3d 299, 303 (Tex. 2006). If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may only be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory. See Birchfield v. Texarkana Mem'l Hosp. , 747 S.W.2d 361, 367 (Tex. 1987). However, if a party seeks recovery under two or more alternate theories of recovery for a single injury, then that party must elect under which remedy he wishes the court to enter a judgment before the judgment is rendered. Star Houston, Inc. v. Shevack , 886 S.W.2d 414, 422 (Tex App.-Houston [1st Dist.] 1994), writ denied per curiam , 907 S.W.2d 452 (Tex. 1995). If the prevailing party fails to make that election, then the trial court should use the findings affording the greater recovery and render judgment accordingly. Birchfield , 747 S.W.2d at 367. If the trial court fails to do so, the appellate court must reform the trial court's judgment to effect such an election. Shevack , 886 S.W.2d at 423.
Discussion
Lufkin's losses are economic in nature, but IBM has a common law legal duty to refrain from fraudulently inducing Lufkin to execute the SOW and subsequent PCR's, and such acts are at the heart of this litigation. Thus, the economic loss rule does not bar Lufkin's fraudulent inducement claim. See Formosa Plastics Corp. , 960 S.W.2d at 46.
Lufkin also brought a separate independent fraud claim-its "string along fraud" theory-alleging that IBM breached a common law duty to Lufkin when it misrepresented its continuing performance under the SOW. Specifically, Lufkin argues that IBM breached a legal duty owed to it when IBM continually promised all would be well if only Lufkin continued to give IBM more money, more time, and more employee resources as stated in the PCRs. It alleges that IBM continued to make these misrepresentations, and failed to disclose that the Express Solution would never function as promised. IBM responded that the fraud claim is precluded by the economic loss rule, and that Lufkin's complaints about its additional costs and delays in implementation of the Express Solution all arise from IBM's fraudulent acts to induce Lufkin's execution of the SOW and PCRs. Consequently, its argument continues, Lufkin's fraud claim is subsumed as part of its fraudulent inducement claim. We agree with IBM's latter contention.
Lufkin acknowledged in its brief that the fraudulent inducement claim includes not only IBM's false representations in inducing it to execute the SOW, but also IBM's representations to induce Lufkin's execution of the subsequent PCRs after problems arose in the implementation process. IBM's reassurances that the Express Solution would function as represented induced Lufkin to execute the PCRs, especially given that Lufkin had expended considerable time and resources in the project. These reassurances to "string" Lufkin along are the same as the representations IBM made to induce Lufkin's execution of the PCRs after the SOW became effective. The substance of Lufkin's independent fraud claim, and the duty it arises from, is the same as that for its fraudulent inducement claim.
Moreover, the injury Lufkin suffered, and the remedy it sought, is the same for the fraudulent inducement and separate fraud claims-its out-of-pocket expenses and resulting consequential damages to mitigate IBM's malfeasance. Since Lufkin's fraudulent inducement claim includes the representations to Lufkin that induced *33 it to sign the SOW and PCR's, it has not shown that it suffered a separate, distinct injury from the allegations in its fraudulent inducement claim to support a separate claim for fraud. In other words, the fraudulent misrepresentations made by IBM to string Lufkin along cannot be part of its fraud claim separate from its fraudulent inducement claim.
We hold that Lufkin could not recover on the separate fraud claim apart from and in addition to the fraudulent inducement claim because all of its allegations were based on IBM's representations to induce Lufkin's execution of the SOW and subsequent PCRs. See Heil Co. v. Polar Corp. , 191 S.W.3d 805, 816 (Tex. App.-Fort Worth 2006, pet. denied). Consequently, although the fraud claim does not run afoul of the economic loss rule per se, the fraud claim is in essence an alternate form of recovery for the same injury, and the jury awarded a lesser amount for that claim.[5] Therefore, the trial court properly awarded damages to Lufkin under the larger recovery in accordance with the jury's verdict, which was its fraudulent inducement claim. See Birchfield , 747 S.W.2d at 367 ; see also Shevack , 886 S.W.2d at 423.
We sustain IBM's third issue. Because we have concluded that Lufkin may not pursue a separate fraud claim, we also sustain IBM's fourth issue and overrule Lufkin's cross-appeal. See TEX. R. APP . P. 47.1.
DAMAGES
In its fifth issue, IBM contends that Lufkin did not present competent expert testimony or any other legally sufficient evidence of its damages in accordance with the elements of damages in the jury charge. Alternatively, IBM contends that even if Lufkin is entitled to damages, the evidence is insufficient to support the amount awarded by the jury, and consequently, we should suggest a remittitur. Finally, IBM argues that even if Lufkin had presented sufficient evidence of damages, the trial court erred in failing to reduce the damages award in accordance with the parties' contractual limit of liability.
Standard of Review
We use the same sufficiency standard of review for damages as that described above in the fraudulent inducement section of this opinion. See Wilson , 168 S.W.3d at 815, 822, 827.
If part of a damages verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict, giving the party prevailing in the trial court the option of accepting the remittitur or having the case remanded for a new trial. See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp. , 299 S.W.3d 106, 124 (Tex. 2009) ("[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment[ ]"); Samuels v. Nasir , 445 S.W.3d 886, 894 (Tex. App.-El Paso 2014, no pet.) ( Texas Rule of Appellate Procedure 46.3 permits court to suggest remittitur when "appellant complains *34 there is insufficient evidence to support an award and the court of appeals agrees, but concludes there is sufficient evidence to support a lesser award").
Out-of-Pocket Expenses
One measure of direct damages for fraud recognized under Texas law is the out-of-pocket measure, computed as the difference between the value paid and the value received. Aquaplex, Inc. v. Rancho La Valencia, Inc. , 297 S.W.3d 768, 775 (Tex. 2009). A jury's award of damages within the range of evidence will be upheld if damages were submitted in a broad form question and are not itemized. See Mays v. Pierce , 203 S.W.3d 564, 579 n.20 (Tex. App.-Houston [14th Dist.] 2006, pet. denied). As a general rule, the fact finder has broad discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for their calculation. Basic Energy Serv. v. D-S-B Properties , 367 S.W.3d 254, 266 (Tex App.-Tyler 2011, no pet.). The trier of fact may consider, in determining the actual value to the owner at time of loss, the original cost, costs of replacement, opinions of qualified witnesses, including the owner, use to which the property was put, as well as any other reasonably relevant facts. Gulf States Utils. Co. v. Low , 79 S.W.3d 561, 566 (Tex. 2002)
It is undisputed that Lufkin paid IBM $12,983,736 for the implementation of the Express Solution. Lufkin experts Mohan Rao and Hanif Sarangi testified that the Express Solution had a value of 2.3 million dollars for Lufkin. IBM did not submit any evidence during the trial on the value of its Express Solution to Lufkin. This resulted in evidence constituting $10,683,736 of out-of-pocket losses that Lufkin had for the Express Solution.
Sarangi testified that he had been a project manager on sixty SAP implementations over the last twenty-three years. This included being the project manager of the implementation of SAP software for the Massachusetts Institute of Technology (MIT). He testified that he reviewed the Express Solution on a detailed basis, in many cases, line by line. Based on his review, when IBM ceased providing meaningful assistance to Lufkin in the middle of 2012, the Express Solution met only ten percent of Lufkin's requirements to operate the SAP software. He described the Express Solution implementation as a base system that had to be completely revamped, line by line, in order to operate Lufkin's SAP software. The jury's award of ten million dollars for Lufkin's out-of-pocket expenses for IBM's fraudulent inducement to enter the Express Solution contract was within the range of legally sufficient evidence. IBM never presented any evidence to rebut the value of the Express Solution implementation as being only 2.3 million dollars for Lufkin. Sarangi's testimony, as a qualified expert witness, was legally sufficient evidence to support the ten million dollar jury award for out-of-pocket damages. See ids="9406892" index="78" url="https://cite.case.law/sw3d/79/561/#p566">id.
Mitigation Expenses
The jury awarded eleven million dollars of mitigation expenses to Lufkin for IBM's fraudulent inducement to sign the contract to implement the Express Solution. Lufkin's evidence for these mitigation or consequential damages arises from the amount it paid its employees and third party contractors. When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable. Formosa Plastics Corp. , 960 S.W.2d at 49 n.1 ; see LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C. , 659 F.3d 450, 463 (5th Cir. 2011) (holding that lender fees and tax obligations incurred due to fraudulent representations *35 were recoverable out-of-pocket expenses); see also Dresser-Rand Co. v. Virtual Automation, Inc. , 361 F.3d 831, 843-44 (5th Cir. 2004) (holding that investment costs could be recovered as out-of-pocket expenses due to a defendant's fraud).
IBM first attacked Rao's testimony that Lufkin's mitigation damages should include the percentage of the salaries Lufkin paid to some of its employees based on how much time they spent trying to restore its business system after the Express Solution implementation process failed. But Rao admitted the salaries would have been paid by Lufkin in its ordinary course of business. He justified his approach by stating that the Lufkin employees would have been doing other work if not working on implementation of the SAP software. Yet, he could not identify what other work any of the employees would have been doing. Reliance on insufficient data and unsupported assumptions, along with the analytical gaps in an expert witness's testimony, renders his opinion conclusionary and without evidentiary value. See Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch , 443 S.W.3d 820, 838 (Tex. 2014) ; see also City of San Antonio v. Pollock , 284 S.W.3d 809, 816 (Tex. 2009) (stating that conclusory testimony is incompetent evidence that will not support a judgment). There is thus no evidence of Lufkin's employee salaries that will support the jury mitigation expenses award.
Evidence during the trial showed that Lufkin paid third party contractors $11,965,150.[6] But, the evidence shows to a reasonable degree of certainty that only $7,544,545 was paid after the "Go-Live Ugly" of January 1, 2012.[7] IBM asserts that the remainder of the amount that was paid before that date was part of Lufkin's obligation under the SOW and PCRs. We agree. Lufkin failed to present any evidence to show the amounts paid to third party contractors before January 1, 2012, were not required under its SOW or PCRs with IBM. However, it did present evidence through Sarangi to establish that the amounts paid after January 1, 2012, were to implement a business operating system after the "Go-Live Ugly" failure. Sarangi's testimony and the supporting exhibits also established that Lufkin paid $7,544,545 to third party contractors after *36 the Express Solution "Go-Live Ugly" failure on January 1, 2012, and these amounts were spent to restore operation of Lufkin's business system software after it was required to operate manually for much of the six months immediately following the "Go-Live Ugly" failure.
As set out above, the record contains some evidence of replacement damages, but does not support the full award. See ERI Consulting Eng'rs, Inc. v. Swinnea , 318 S.W.3d 867, 877-78, 880 (Tex. 2010) (holding that evidence was legally insufficient to support amount of lost profit damages awarded by trial court, but there was "legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty," and remanding case to court of appeals to consider suggestion of remittitur); see also Aquaplex, Inc. , 297 S.W.3d at 777 (holding that some evidence supported award of damages, but not at level awarded by trial court, and remanding to court of appeals to determine whether to remand for new trial on damages or suggest remittitur).
Because the evidence is sufficient to support some, but not all of the damages awarded by the jury, we suggest a remittitur of mitigation damages in the amount of $3,455,455, thereby reducing mitigation damages from $11,000,000 to $7,544,545. If Lufkin timely files the remittitur, we will reform and affirm that portion of the judgment. See TEX. R. APP . P. 46.3 ; Akin, Gump, Strauss, Hauer & Feld, L.L.P. , 299 S.W.3d at 124. However, if Lufkin does not timely file the remittitur, we will reverse the trial court's judgment and remand for a new trial. See id. In that event, we are required to reverse the judgment on both liability and damages. See TEX. R. APP . P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested."); see also Rancho La Valencia, Inc. v. Aquaplex, Inc. , 383 S.W.3d 150, 152 (Tex. 2012) (per curiam) (holding in similar circumstances that if party fails to accept remittitur, court of appeals must reverse trial court's judgment and remand for new trial on both liability and damages).
1991 IBM Customer Agreement
Also, as part of its fifth issue, IBM contends that Lufkin's damages for fraudulent inducement should be capped at $10,683,736 because of a 1991 customer agreement incorporated into the SOW, the terms of which limit Lufkin's damages to the amount paid to IBM.[8] Lufkin counters that it never signed the agreement, and although offered, it was never admitted as evidence at trial.
We review a trial court's decision to admit or exclude evidence for an abuse of discretion. In re J.P.B. , 180 S.W.3d 570, 575 (Tex. 2005). To be enforceable, a contract must be accepted. See Town of Lindsay v. Cooke Cty. Elec. Coop. , 502 S.W.2d 117, 118 (Tex. 1973). The parties may incorporate other documents by reference within their contract, but to be enforceable, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms. See Bob Montgomery Chevrolet v. Dent Zone Companies , 409 S.W.3d 181, 189 (Tex. App.-Dallas 2013, no pet.).
IBM offered a document into evidence containing the document reference number "Z125-4575-001/91." IBM contended that this document was the 1991 customer agreement incorporated into the SOW. However, the customer agreement referenced in the SOW was to document number "HQ1229." The witness IBM used to *37 offer this purported 1991 customer agreement into evidence did not explain the differences between the two document reference numbers. It was thus within the trial court's discretion to deny admittance of the 1991 customer agreement into evidence. We hold that the purported 1991 customer agreement, which was not admitted into evidence, could not be used to cap Lufkin's damages awarded under its fraudulent inducement of contract claim.
IBM's fifth issue is sustained in part and overruled in part.
LUFKIN'S CONDITIONAL CROSS-ISSUE ON BREACH OF CONTRACT
Lufkin filed a conditional cross-issue on its breach of contract claim.[9] The jury determined that IBM breached its contract with Lufkin, yet awarded no damages. Lufkin sought a new trial if its fraudulent inducement claim was not upheld. Because we have affirmed the fraudulent inducement claim and a substantial portion of the damages awarded by the jury on fraudulent inducement, which would be larger than any recovery under the breach of contract claim, we overrule Lufkin's cross-issue.
DISPOSITION
The judgment of the trial court awarding an alternative judgment of $6,000,000 to Lufkin on its fraud claim is reversed and rendered that Lufkin take nothing on that claim. We reverse the portion of the trial court's judgment awarding $11,000,000 in mitigation expenses and suggest a remittitur in the amount of $3,455,455, thereby reducing mitigation expenses from $11,000,000 to $7,544,545. If Lufkin timely files the remittitur in the trial court within fifteen days of the date of this opinion, we will reform and affirm that portion of the judgment. See TEX. R. APP . P. 46.3, 46.5 ; see also Akin, Gump, Strauss, Hauer & Feld, L.L.P. , 299 S.W.3d at 124. However, if Lufkin does not timely file the remittitur, we will reverse the trial court's judgment and remand for a new trial. See Akin, Gump, Strauss, Hauer & Feld, L.L.P. , 299 S.W.3d at 124 ; see also TEX. R. APP . P. 44.1(b). The remainder of the judgment of the trial court is affirmed .
SUPPLEMENTAL MEMORANDUM OPINION
In our opinion issued on July 12, 2017, this Court reversed the portion of the trial court's judgment awarding Lufkin Industries, Inc. (Lufkin), $11,000,000.00 in mitigation expenses and suggested a remittitur in the amount of $3,455,455.00, resulting in $7,544,545.00 in mitigation expenses, thereby reducing total actual damages to $17,544,545.00.
In our opinion and order, we stated that if Lufkin filed the remittitur with the trial court clerk within fifteen days of our opinion and notified this Court of such, we would modify the judgment and affirm the damages award in accordance with the remittitur, thereby obviating the need for a new trial. See TEX. R. APP. P. 46.3, 46.5.
On July 27, 2017, the trial court clerk filed a supplemental clerk's record in this Court containing Lufkin's remittitur, which showed that it had timely filed the remittitur with the clerk. Accordingly, we modify the trial court's judgment to reflect that the amount of the judgment for mitigation damages awarded to Lufkin is reduced to the sum of $7,544,545.00, resulting in a reduction of total actual damages *38 to $17,544,545.00. See TEX. R. APP. P . 46.3, 46.5.
The judgment of the trial court awarding an alternative judgment of $6,000,000.00 to Lufkin on its fraud claim is reversed and rendered that Lufkin take nothing on that claim.
As part of its remittitur, Lufkin requests that we recalculate the trial court's prejudgment interest award. This court has the power to modify the judgment of the court below to make the record speak the truth when we have the necessary information to do so. See TEX. R. APP. P. 43.2(b) ; Shamoun v. Shough , 377 S.W.3d 63, 78 (Tex. App.-Dallas 2012, pet. denied). Lufkin's total actual damages are $17,544,545.00, and it is entitled to prejudgment interest at the rate of 5% per year from January 18, 2013 to September 10, 2015. Therefore, Lufkin is entitled to prejudgment interest in the amount of $2,319,244.65 (965 days multiplied by $2,403.36 per day), for a total award of $19,863,789.60. IBM agrees with this calculation.
We affirm the trial court's judgment in all other respects. This Court's opinion of July 12, 2017, otherwise remains in effect.

Lufkin also had a third division, the foundry, which molds and manufactures parts to service Lufkin's other divisions and third parties.

IBM's Express Solution is derived from, and works in conjunction with, SAP software. SAP is a corporation that makes complex and sophisticated enterprise software to manage business operations.

The trial court also noted in its judgment that the jury found that IBM committed fraud and awarded six million dollars in damages. The trial court found the evidence sufficient to support those findings, but stated that Lufkin elected to recover under the fraudulent inducement cause of action, and had it elected to recover under the fraud theory, the court would have rendered judgment against IBM for six million dollars, plus prejudgment and postjudgment interest.

The following elements are required for a formation of a valid and binding contract: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. Critchfield v. Smith , 151 S.W.3d 225, 233 (Tex. App.-Tyler 2004, pet. denied). Consideration is also a fundamental element of every valid contract. Burges v. Mosley , 304 S.W.3d 623, 628 (Tex. App.-Tyler 2010, no pet.).

The jury awarded six million dollars in damages for the separate fraud claim. We have held that the fraud theory is subsumed as part of Lufkin's fraudulent inducement claim. The jury's six million dollar award appears to represent the jury's attempt to compensate Lufkin for the salaries it paid employees to work on the implementation project. However, we conclude in the damages section of this opinion that the evidence is insufficient to support the award of those damages. Therefore, even if Lufkin could pursue a separate fraud theory, no damages would support the claim based on the court's charge as presented and the jury's resulting answers.

Lufkin's Exhibit 5984 contains a list detailing the invoices from third party vendors to Lufkin over the entire course of the project. The exhibit identifies each vendor, service dates, invoice date, invoice amount, type of service, and corresponding Bates numbers to the actual invoices and supporting documentation in Lufkin's Exhibit 5976. Lufkin calculated the total amount in Exhibit 5984 as $11,781,295, whereas IBM calculated the total as $11,965,150. We have conducted our own review and determined that the invoices in Exhibit 5984 total $11,965,150.

To calculate this amount, we removed all invoices for work billed and completed prior to December 31, 2011. We included the entire amount for invoices based on work completed solely in 2012 or later. The remaining invoices contained amounts for work performed near the end of 2011 and continuing into early 2012 in a single invoice. In those cases, we examined Lufkin's Exhibit 5976, and we were able to discern from the invoices the amount to be redacted for work performed in 2011, along with the corresponding expenses and taxes incurred during that period. There were two exceptions. After a diligent search of this voluminous record, we were unable to locate the supporting invoices for (1) LUFKIN00417669, RGB Technologies (Tunnell), representing work performed from December 11, 2011, through January 7, 2012, in the amount of $25,500, and (2) LUFKIN00404288, Sparta, representing work performed from December 27, 2011, through January 6, 2012, in the amount of $11,040. Consequently, we cannot conclude that it is appropriate to include these two invoices in our calculation.

This figure represents the $12,983,736 that Lufkin paid IBM less the $2,300,000 in value it received from IBM for the Express Solution.

Lufkin raised this conditional cross-issue in its response brief, as opposed to its cross-appeal, because it was the prevailing party and did not seek to modify the trial court's judgment on this ground unless we reversed the fraudulent inducement claim. See Tex. R. App . P. 25.1(c) ; see also City of Austin v. Whittington , 384 S.W.3d 766, 789 (Tex. 2012).