# IN THE SUPREME COURT OF TEXAS

════════════

No. 17-0666

════════════

INTERNATIONAL BUSINESS MACHINES CORPORATION, PETITIONER,

v.

LUFKIN INDUSTRIES, LLC, RESPONDENT

════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS
════════════════════════════════════════════

**Argued December 6, 2018**

JUSTICE BOYD delivered the opinion of the Court.

JUSTICE BLACKLOCK did not participate in the decision.

Under Texas law, a party may be liable in tort for fraudulently inducing another party to enter into a contract. But the party may avoid liability if the other party contractually disclaimed any reliance on the first party's fraudulent representations. Whether a party is liable in any particular case depends on the contract's language and the totality of the surrounding circumstances. In this case involving a contract to purchase a business-management software system, we hold that contractual disclaimers bar the buyer from recovering in tort for misrepresentations the seller made both to induce the buyer to enter into the contract and to induce the buyer to later agree to amend the contract. But we also hold that, contrary to the jury's finding, the evidence conclusively established that the seller's breach of the contract caused the buyer to suffer some amount of damages. Reversing the court of appeals' judgment in part, we render

judgment for the seller on the fraudulent-inducement claims and remand the case to the trial court for a new trial on the breach-of-contract claims.

## I.
## Background[1]

Lufkin Industries, a publicly traded company based in Lufkin, Texas, manufactures machinery and equipment used in various segments of the energy industry. In 2009, Lufkin decided to upgrade its business-operations computer-software system. Over a period of several months, Lufkin and IBM engaged in numerous meetings, "discovery workshops," and other discussions in which they exchanged information about Lufkin's needs and IBM's capabilities. Lufkin's representatives explained that Lufkin needed an "out-of-the-box" or "off-the-shelf" system that could quickly replace its old system for a price lower than the cost of upgrading that system. Based on Lufkin's operational needs, IBM recommended its "Express Solution for SAP," which utilizes software developed by SAP, a separate German corporation.

During these extended discussions, IBM made numerous representations about its Express Solution that turned out to be false. IBM represented that the Express Solution was a preconfigured system that could be implemented for Lufkin within four to six months and meet eighty percent of Lufkin's requirements without any enhancements. IBM knew, however, that its Express Solution would require extensive customization before it could meet most of Lufkin's needs. Yet IBM continued to represent the Express Solution as a "fit" for Lufkin, hoping it could land the sale and then figure out how to provide what Lufkin needed.

---

[1] Because IBM appeals from a judgment based on a jury verdict in Lufkin's favor, we recite the facts that support the jury's findings, in a light most favorable to Lufkin. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 709 (Tex. 2016).

In September 2009, IBM presented a demonstration of the Express Solution for Lufkin. During this demonstration, IBM's representatives again represented that the Express Solution would meet eighty percent of Lufkin's needs without any customization. In fact, the representatives knew that Express Solution was designed for much smaller operations and could not meet Lufkin's requirements without extensive and costly enhancements. Relying on IBM's misrepresentations, Lufkin agreed to a written contract with IBM in March 2010. The contract—called the "Statement of Work," or "SOW"—gave IBM about a year to finalize and implement the system, projecting that Lufkin could "go live" with IBM's Express Solution system on March 1, 2011.

The implementation did not go well. Beginning in November 2010, the new system failed multiple test runs. Each time, IBM assured Lufkin that the system would work as planned if Lufkin would just be patient while IBM addressed the issues. Over time, IBM convinced Lufkin to approve nine different "Project Change Requests" in which Lufkin agreed to delay the "go-live" date and increase the overall price. Ultimately, Lufkin paid IBM just under $13 million, an increase of about $6.6 million over the original price, and agreed to settle for a "go-live-ugly" implementation on January 1, 2012. Lufkin only agreed to these repeated delays and increased costs because IBM continued to represent that once implemented, the Express Solution would meet Lufkin's needs without any further enhancements, and by then it had invested so much time and money it could not start the process over.

On the day of the "go-live-ugly," Lufkin deactivated its old system at IBM's instruction. But Lufkin was unable to use the Express Solution to invoice customers, manage inventory, track orders, shipments, or costs, calculate payroll, or pay employees and vendors. Because the system

3

did not integrate with Lufkin's financial modules, Lufkin had to delay filing public financial reports, and its stock lost value. In short, the system failure crippled Lufkin's business.

Initially, Lufkin scrambled to perform all the necessary functions manually. Over the next year and a half, Lufkin worked with SAP and other new consultants to construct and stabilize a working system. Ultimately, Lufkin paid these consultants an additional $7.5 million to salvage the system IBM had delivered.

Lufkin filed this suit against IBM, asserting claims for fraudulent inducement, fraudulent misrepresentation and concealment, negligent misrepresentation, and breach of contract.[2] At trial, the jury found IBM liable on all claims. As damages for fraudulent inducement, the jury awarded $10 million for out-of-pocket losses and $11 million for additional costs to mitigate and replace IBM's system. As damages for fraud—which Lufkin refers to as "string-along fraud"—the jury awarded $3 million for out-of-pocket losses and $3 million for mitigation costs. But the jury awarded zero damages for negligent misrepresentation and breach of contract.

Based on the jury's verdict, the trial court entered judgment awarding Lufkin $21 million for fraudulent inducement, or alternatively, $6 million for the string-along-fraud claim "if the judgment above for fraudulent inducement is reversed by an appellate court." The court of appeals upheld IBM's liability for fraudulent inducement but reversed the alternative string-along-fraud award, concluding that claim was based on the same misrepresentations as the fraudulent-inducement claim. *Int'l Bus. Machs. Corp. v. Lufkin Indus., Inc.*, 564 S.W.3d 15, 32 (Tex. App.—Tyler 2017). The court also concluded that the evidence did not support all of the $11 million in

---

[2] Lufkin asserted other claims against IBM and other defendants, but ultimately submitted only these claims against IBM to the jury.

4

mitigation damages and suggested a remittitur of about $3.5 million, which Lufkin accepted. *Id.* at 37.

We granted IBM's petition for review. IBM argues that the court of appeals erred by affirming liability for fraudulent inducement because Lufkin expressly disclaimed reliance on IBM's misrepresentations. Lufkin disagrees and also argues by conditional cross-points that, if we were to reverse the fraudulent-inducement award, we should render judgment in its favor on the string-along-fraud claim and either render judgment on the breach-of-contract claim or remand that claim for a new trial.

We hold that (1) Lufkin cannot recover for fraudulent inducement because it expressly disclaimed any reliance on IBM's misrepresentations, (2) Lufkin cannot recover for so-called string-along fraud for the same reason, and (3) Lufkin is entitled to a new trial on its claim for breach of contract because the evidence conclusively established that it suffered some amount of damages as a result of IBM's breach.

## II.
## Fraudulent Inducement

Fraudulent inducement is a "species of common-law fraud" that "arises only in the context of a contract." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). Like a broader common-law fraud claim, a fraudulent-inducement claim requires proof that: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Id.* In a fraudulent-inducement claim, the "misrepresentation" occurs when the defendant falsely promises to perform a future act while

5

having no present intent to perform it. *Id.* The plaintiff's "reliance" on the false promise "induces" the plaintiff to agree to a contract the plaintiff would not have agreed to if the defendant had not made the false promise. *See id.*

The court of appeals held that sufficient evidence supports the jury's finding that IBM knowingly misrepresented its ability to provide the software system Lufkin required, and IBM does not challenge that holding here. Instead, IBM argues that Lufkin did not and cannot establish that it detrimentally relied on IBM's misrepresentations because Lufkin expressly disclaimed any such reliance in two provisions of the Statement of Work. First, in section 2, Lufkin agreed:

> In entering into this SOW, Lufkin Industries is not relying upon any representation made by or on behalf of IBM that is not specified in the Agreement[3] or this SOW, including, without limitation, the actual or estimated completion date, amount of hours to provide any of the Services, charges to be paid, or the results of any of the Services to be provided under this SOW. This SOW, its Appendices, and the Agreement represent the entire agreement between the parties regarding the subject matter and replace any prior oral or written communications.

Similarly, in section 2.11, the parties agreed:

> This SOW and the referenced Agreement identified below are the complete agreement between Lufkin Industries and IBM regarding Services, and replace any prior oral or written communications between us. Accordingly in entering into this SOW, neither party is relying upon any representation that is not specified in this SOW including without limitation, any representations concerning 1) estimated completion dates, hours, or charges to provide any Service; 2) the experiences of other customers; or 3) results or savings Lufkin Industries may achieve.

---

[3] The Statement of Work incorporates a document referred to as "the IBM Customer Agreement ('ICA'), number HQ 12291, dated January 22, 1991." Lufkin denies that it ever signed such an agreement. At trial, IBM proffered a document, but it was never entered into evidence.

Both of these provisions include a merger clause, providing that the Statement of Work and the incorporated Customer Agreement contain the parties' "entire" or "complete" agreement and "replace any prior oral or written communications." And both also include a disclaimer clause, disclaiming any reliance on any representation that is "not specified" in the Statement of Work or the Customer Agreement.

We have held that a merger clause, standing alone, does not prevent a party from suing for fraudulent inducement. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 327 (Tex. 2011). And similarly, a clause that merely recites that the parties have not made any representations other than those contained within the written contract is not effective to bar a fraudulent-inducement claim. *Id.* at 334. But a clause that clearly and unequivocally expresses the party's intent to disclaim reliance on the specific misrepresentations at issue can preclude a fraudulent-inducement claim. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60–61 (Tex. 2008); *see also Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997). Not every such disclaimer is effective, and courts "must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding." *Forest Oil*, 268 S.W.3d at 60. Specifically, courts must consider such factors as whether

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;
> (2) the complaining party was represented by counsel;
> (3) the parties dealt with each other at arm's length;
> (4) the parties were knowledgeable in business matters; and
> (5) the release language was clear.

*Italian Cowboy*, 341 S.W.3d at 337 n.8; *see also Forest Oil*, 268 S.W.3d at 60. When "sophisticated parties represented by counsel disclaim reliance on representations about a specific

matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in a suit for fraudulent inducement." *Italian Cowboy*, 341 S.W.3d at 332 (citing *Schlumberger*, 959 S.W.2d at 179).

We have no trouble concluding that the factors generally support a finding that Lufkin effectively disclaimed reliance on IBM's misrepresentations. The parties negotiated the Statement of Work at arm's length, they were both knowledgeable in business matters and represented by counsel,[4] and the two clauses expressly and clearly disclaim reliance. But as Lufkin points out, the clauses only disclaim reliance on representations that are "not specified" in the Statement of Work or the Customer Agreement. Relying on two other provisions, Lufkin argues that the misrepresentations on which it based its fraudulent-inducement claim were "specified" in the Statement of Work, and at a minimum, reading those provisions together with the disclaimers' "not specified" language renders the clauses too ambiguous to be enforceable. We are not convinced.

## A. The no-enhancements provision

To avoid the disclaimer of reliance on representations "not specified" in the Statement of Work, Lufkin relies primarily on a provision in which IBM represented that its Express Solution system would need no "enhancements." Specifically, under a section entitled "Project Scope," the Statement of Work states:

> The following Enhancements will be developed as part of this project:

---

[4] Lufkin argues that the disclaimers were "non-negotiated boilerplate" provisions, but the factors do not require that every sentence in a contract be negotiated. Lufkin acknowledges that it negotiated "certain deal points," and it does not contend that it could not have negotiated the disclaimers if it had wanted to. *See Forest Oil*, 268 S.W.3d at 60. Lufkin also argues that it was not knowledgeable about business-operations software systems, but it does not dispute that it was generally knowledgeable about "business matters."

1. None

Lufkin contends that this no-enhancements provision confirmed in writing IBM's prior representations that the Express Solution system would provide an "out-of-the-box" solution that would meet eighty percent of Lufkin's requirements. Lufkin insists that it did not disclaim reliance on those misrepresentations because they are "specified" in the no-enhancements provision.

We cannot accept Lufkin's reading of the no-enhancements provision. To begin with, it clearly does not *specify*[5] that the Express Solution system would be ready "out-of-the-box" and meet eighty percent of Lufkin's needs without customization. At most, it specifies only that the parties had not then agreed on any particular enhancements. In other provisions, however, the parties agreed that they would discuss and evaluate the need for enhancements during subsequent phases following the product's initial implementation. In section 1.2.1, for example, the Statement of Work provided that IBM would perform a "Post Implementation Review" after the go-live phase and before the "Sustain" phase, and that review would provide "an initial basis for identifying potential enhancements that could be made to improve efficiency."

Consistent with these provisions, Lufkin's chief financial officer, Chris Boone, admitted in his testimony that "there was always a certain amount of . . . customization" expected, and "there was a contingency for things that weren't identified during the discovery process." And Lufkin itself understood that enhancements could be necessary for the product to meet up to twenty percent of its requirements. As Boone testified, there was "always an element of the project that

---

[5] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2187 (1961) (defining "specify" as "to mention or name in a specific or explicit manner: tell or state precisely or in detail"); *see also id.* (defining "specific" as "characterized by precise formulation or accurate restriction").

was going to require some [enhancements[6]], but the original scope of the project requires no enhancements or customization." Reading the contract's provisions together, and in light of Lufkin's own acknowledgements and assertions, we cannot read the no-enhancements provision to mean that no enhancements would *ever* be needed or developed.

Instead, it appears from the trial testimony that the no-enhancements provision may refer to enhancements to SAP's standard software on which the Express Solution system ran, not to the Express Solution system itself. Although the contract does not define the term "Enhancements," both parties accept IBM's corporate representative Juan Gonzales's explanation that the term refers to "code writing outside of what SAP can do, standard SAP can do."[7] Another IBM representative, Anthony Giambone, testified that one of the Statement of Work's "key assumptions" was that the Express Solution would utilize SAP's "standard" software product, which was "one of [the] reasons we didn't have any enhancement originally scheduled." Based on this testimony, which Lufkin's witnesses did not contradict, it may be that the no-enhancements provision refers only to the parties' agreement that IBM's Express Solution system would incorporate only the standard SAP software.

But whatever the no-enhancements provision means, it simply does not "specify" that the Express Solution system would meet eighty percent of Lufkin's needs upon initial implementation. In fact, the reliance disclaimers themselves contradict that construction. Both disclaimers list examples of representations that were "not specified" in the contract, including representations

---

[6] Boone actually referred here to "RICEFs," an acronym the parties used for "reports, interfaces, forms, enhancements, and conversions."

[7] Lufkin witness Kenneth Patrick testified that Lufkin receives "enhancement packages" directly from SAP to update the program.

regarding the project's completion date, the amount of hours necessary to provide services, the charges to be paid for the services, and the "results" of the services IBM provided. We cannot read the no-enhancements provision to specify any such representations when the provision itself states that all such provisions are not specified.

### B. The information-exchanged provision

Lufkin alternatively argues that another provision specifies the misrepresentations on which its fraudulent-inducement claim relies. In this provision, which appears in the contract's introductory section, IBM explained that it based its proposal on information Lufkin had provided to IBM:

> IBM is pleased to submit this Statement of Work ("SOW") to assist Lufkin Industries, Inc. ("Lufkin Industries") with the implementation of SAP. We recognize the significance of this project and the importance of this solution to Lufkin Industries' business. We also recognize the effort Lufkin Industries' staff has expended over the past several months interacting with IBM to share information about the goals and objectives of this project, current business processes and supporting systems. This exchange is the basis of our understanding for this proposal.
>
> We bring years of experience to every project. We apply our experience gained in developing similar solutions for other customers to help develop your solution. We appreciate the opportunity to present this SOW for your approval.

Lufkin argues that this provision's reference to "our understanding" refers to both IBM and Lufkin, and the information the parties "exchanged" during the months leading up to the proposal includes not only information Lufkin provided to IBM but also IBM's misrepresentations regarding the Express Solution system. The court of appeals agreed, holding that the "information" the provision refers to "necessarily includes the representations made by IBM during the sales process, including its sales presentations, which are the same representations IBM argues that the

11

reliance disclaimer provisions purport to negate." *See* 564 S.W.3d at 28. Lufkin argues that it did not disclaim reliance on IBM's misrepresentations because this provision "specifies" those misrepresentations.

Again, we disagree. Within the context of the provision's repeated use of the plural "we" to refer only to IBM, its use of the plural "our" similarly refers only to IBM's understanding on which it based its proposal. We read the provision to explain that IBM based its proposal on its understanding of Lufkin's goals, objectives, processes, and systems, which IBM obtained from information Lufkin "shared" with IBM during the parties' "exchange" leading up to the proposal. The provision thus serves more as a recital than an operative term, stating the circumstances surrounding the contract's formation. *See Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 336 (Tex. App.—Dallas 2011, no pet.) (defining recital as "[a] preliminary statement in a contract or deed explaining the reasons for entering into it or the background of the transaction, showing the existence of particular facts") (quoting *Recital*, BLACK'S LAW DICTIONARY (8th ed. 2004)).

By contrast, Lufkin's reading of the information-exchanged provision improperly renders the two disclaimers superfluous. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 770 (Tex. 2018); *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 24 (Tex. 2015). Lufkin's construction would mean that the parties agreed that, "in entering into" the contract, they did not rely on any representations except those the parties made to each other before they entered into the contract. Of course, that would mean that they did not disclaim reliance on any representations at all.

We cannot read the information-exchanged provision to contain any representations by IBM, other than the representation that it relied on Lufkin's information to prepare its proposal. It

12

certainly does not "specify" any particular representations IBM made during the parties "exchange," including representations that the Express Solution system provided an out-of-the-box solution that would meet eighty percent of Lufkin's requirements upon implementation. We conclude that the information-exchanged provision does not negate Lufkin's disclaimer of reliance on those misrepresentations.

### C. Ambiguity

Finally, Lufkin argues that, in light of the no-enhancements and information-exchanged provisions, the disclaimers do not "clearly and unequivocally" disclaim reliance as our precedent requires, *see Forest Oil*, 268 S.W.3d at 60, particularly when the disclaimer appears in an agreement that initiates the parties' business relationship, *see Italian Cowboy*, 341 S.W.3d at 335. The court of appeals agreed that the information-exchanged provision makes the disclaimers ambiguous because the "information" the provision refers to "necessarily includes the representations made by IBM during the sales process, . . . which are the same representations IBM argues that the reliance disclaimer provisions purport to negate." 564 S.W.3d at 28. But as we have explained, the court of appeals' construction of the information-exchanged provision renders the disclaimers meaningless, not ambiguous. Ambiguity exists when a provision is susceptible to two or more reasonable constructions, *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017), and a construction that renders the disclaimers meaningless is not reasonable, *Tex. Health Presbyterian Hosp. of Denton v. D.A.*, No. 17-0256, — S.W.3d —, 2018 WL 6713207, at *6 (Tex. Dec. 21, 2018).

We conclude that the disclaimers clearly and unequivocally confirm that, in entering into the Statement of Work, Lufkin did not rely on any representations IBM made except those that

13

were specified in the parties' written agreement. And although the no-enhancements and information-exchanged provisions may be ambiguous, they do not render the disclaimers ambiguous, and they certainly do not "specify" that IBM's Express Solution system was an out-of-the-box system that would meet eighty percent of Lufkin's requirements upon initial implementation. We thus conclude that Lufkin disclaimed reliance on IBM's representations and, as a result, cannot recover for fraudulent inducement based on those representations.[8]

### III.
### String-Along Fraud

By a conditional cross-point of error, Lufkin argues that if we reverse the award for fraudulent inducement we should reinstate the trial court's alternative judgment awarding $6 million for common-law fraud. Characterizing this as a claim for "string-along fraud," Lufkin argued—and the jury agreed—that IBM committed fraud *after* the parties entered into the Statement of Work by repeatedly and knowingly misrepresenting that its Express Solution system would meet Lufkin's needs if Lufkin would agree to delay the go-live date and pay more money. Lufkin contends that, by relying on these post-contractual misrepresentations, it suffered costly delays and damages through the $6.6 million it agreed to add to the original price. The jury found for Lufkin on this theory and awarded $6 million in damages, and the trial court's judgment conditionally awarded those damages, in the event that the fraudulent-inducement award were reversed on appeal.

The court of appeals upheld the fraudulent-inducement award but reversed the conditional string-along-fraud award, concluding that it was based on the same misrepresentations and same

---

[8] In light of this holding, we need not address IBM's arguments challenging the damages the trial court awarded for fraudulent inducement.

14

injuries and thus subsumed within the fraudulent-inducement claim. 564 S.W.3d at 33. In this Court, Lufkin argues that its so-called string-along-fraud claim is based on different misrepresentations and sought different damages than its fraudulent-inducement claim.

In reality, Lufkin's string-along-fraud claim is also a fraudulent-inducement claim, because it asserts that IBM's continued misrepresentations induced Lufkin to agree to IBM's project change requests. We conclude that the disclaimers bar Lufkin's string-along-fraud claim for the same reasons they bar Lufkin's fraudulent-inducement claim. Lufkin argues that the disclaimers do not apply to the misrepresentations IBM made *after* they signed the Statement of Work because the disclaimers state only that the parties did not rely on representations when "entering into" the Statement of Work. But each time Lufkin authorized a change by signing a project change request, it agreed that the parties' "complete agreement" would include that change authorization, all prior change authorizations, the Statement of Work, and the Customer Agreement. And section 2 of the Statement of Work characterizes changes resulting from the agreed "Project Change Control Procedure" as "[c]hanges to this [Statement of Work]." So with each change authorization, Lufkin reaffirmed that it was not relying on IBM's representations "in entering into" the Statement of Work, which then included the change authorization.

Lufkin argues, however, that its string-along fraud claim is based on IBM's breach of "a common law, not contractual, duty not to misrepresent its continuing performance" and a common-law duty "to disclose information to correct earlier misrepresentations." While we agree that fraud is a common-law creation, we do not see how that invalidates Lufkin's reaffirmations of the disclaimer of reliance in the project change requests. Lufkin's argument that IBM's string-along fraud breached a common law "duty to disclose information to correct earlier misrepresentations"

15

also fails. Lufkin cannot maintain a claim that it reasonably relied on any earlier misrepresentations when it disclaimed reliance on such misrepresentations in the Statement of Work and the project change requests. We thus conclude that Lufkin cannot recover on its string-along-fraud claim.

## IV.
## Breach of Contract

Finally, Lufkin argues that if we reverse the judgment on its fraudulent-inducement claim, we should render judgment in its favor on its contract claim, or at least remand the case for a new trial on that claim. We agree that Lufkin is entitled to a new trial on its contract claim.

The jury found that IBM breached the parties' contract, but then awarded "$0" as damages for that breach. Lufkin challenged the zero-damages finding in the trial court and on appeal,[9] but the court of appeals overruled Lufkin's cross-point because the award it affirmed for fraudulent inducement—which included both out-of-pocket and mitigation damages—exceeded any damages Lufkin could recover for breach. 564 S.W.3d at 37. Now that we have reversed the fraudulent-inducement award, Lufkin argues that we should disregard the jury's zero-contract-damages answer because no evidence supports that finding, and we should render judgment awarding $10,683,736 because the evidence conclusively established that Lufkin sustained that amount as out-of-pocket losses.[10]

---

[9] Asserting that the measure of out-of-pocket damages—the difference between the value paid and value received—is the same for both contract and fraud claims, Lufkin surmises that the jury erroneously awarded zero damages on the contract claim because it had already awarded out-of-pocket damages on the fraudulent-inducement claim. Lufkin suggests that the "jury apparently heeded the trial court's multiple instructions 'not [to] compensate twice for the same loss, if any,' but did so in a way that its findings on liability and damages are contradictory."

[10] Lufkin's evidence established that it paid IBM a total of $12,983,736, and that the value of the services it received from IBM was $2.3 million. IBM challenges the sufficiency of Lufkin's value evidence, but it did not provide evidence controverting the $2.3 million figure.

16

IBM argues that we cannot disregard the jury's zero-damages answer because this Court lacks jurisdiction over an argument that a jury finding is against the great weight and preponderance of the evidence. *See Tippett v. Brannon*, 493 S.W.2d 511 (Tex. 1973) (per curiam) ("This Court does not have jurisdiction to pass upon the fact questions of the sufficiency of the evidence, or the great weight and preponderance of the evidence."); *Gulf, Colo. & Santa Fe Ry. Co. v. Deen*, 312 S.W.2d 933, 938 (Tex. 1958) ("Being a court of law only, we will not review a holding of the Court of Civil Appeals that a verdict is or is not against the great weight and preponderance of the evidence, the holding being considered one of fact."). But Lufkin urges us to disregard the jury's answer not only because it "was against the great weight and preponderance of the evidence," but also because it "has no support in the evidence." We construe Lufkin's brief to assert that the evidence was both legally and factually insufficient,[11] and we have jurisdiction to address the legal argument.

In addressing Lufkin's challenge to the jury's zero-damages finding, we must distinguish "uncertainty as to the fact of damages" from "uncertainty merely as to the amount of damages." *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex. 1985). Lufkin argues that the evidence conclusively established the *amount* of its contract damages, but its legal challenge to the jury's zero-damages finding rests on an assertion that the evidence conclusively established that it suffered *some* damages—some amount more than zero—as a result of IBM's breach. Because Lufkin bore the burden of proof on that issue, it must demonstrate on appeal that the

---

[11] *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633 (Tex. 1986) ("It is our practice to liberally construe the points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants. We look not only at the wording of the points of error, but to the argument under each point to determine as best we can the intent of the party.") (quoting *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982)).

evidence conclusively established the fact of damages as a matter of law. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). To conclusively establish that fact, the evidence must leave "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982).

Lufkin argues that it meets this burden because the evidence conclusively established—as the jury found—both that IBM breached the contract and that Lufkin suffered out-of-pocket damages. Specifically, Lufkin contends, it submitted uncontroverted evidence that IBM's Express Solution system did not meet the requirements Lufkin bargained for and, as a result, the value Lufkin received was less than the amount it paid to IBM. In response, IBM asserts that Lufkin did not conclusively establish the fact of contract damages because Lufkin's expert testified that IBM's breach caused no damages, and because Lufkin failed to specify the alleged breaches or segregate its out-of-pocket damages to any breaches the jury may have found.

We do not agree that Lufkin's expert witness testified that IBM's breach did not cause Lufkin any damages. The testimony IBM relies on is that of Rosemary Lee, an IT consultant. Lee testified that IBM's efforts to "blueprint" the project before the go-live date were insufficient and that it did not properly identify the system's data requirements.[12] IBM's theory at trial was that any delays resulted from Lufkin's resistance to change, and specifically that Lufkin delayed converting its data for the new system. Lee testified that, in her opinion, IBM's failure to properly

---

[12] A system blueprint is a large document that includes all the system requirements and the system design. It "should be in sufficient detail to allow later configuration . . . to physically meet those requirements." That is, it should contain detailed instructions on how to physically configure the system to function as required.

blueprint the process was a "potential cause" of the delays in converting Lufkin's data, but in any event, Lufkin's data-conversion efforts were not "delayed or behind." She further testified that IBM's failure to stabilize the system "by definition . . . put the conversion in a state where it couldn't be completed," but that any issues with delays in Lufkin's data conversion "did not cause significant problems."[13]

Lee later testified that, specifically regarding loading data in a thirty-three day period, IBM did not cause problems or delays "overall." She did criticize IBM for failing to load the data earlier in the project so it could "assess how efficient your load programs were working." Like Lufkin, we read Lee's testimony to opine that Lufkin did not cause the problems it endured by delaying its data conversion, not that Lufkin did not suffer damages as a result of IBM's breach.

Nor do we agree that Lufkin's failure to specify or obtain findings on exactly how IBM breached the contract requires the conclusion that reasonable jurors could find that its breach caused Lufkin no damages. As IBM suggests, it could be that the jury found that IBM breached the contract in only certain ways, and those breaches did not diminish the system's value as much as Lufkin's expert explained. But the jury found that IBM did breach the contract and that Lufkin sustained out-of-pocket damages, and we agree that the evidence that supported these findings was sufficient to conclusively establish the *fact* of contract damages.

---

[13] Specifically, Lee testified as follows:

Q. What was your opinion about the existence of any problems at Go-Live due to data conversion issues by Lufkin?

A. The issue logs indicated that there were no significant data issues post Go-Live.

Q. And so, the delays that are reflected in the documents that you reviewed, is it your opinion that those alleged delays that people talked about and the risk of data conversion issues, that they did not cause significant problems at Go-Live?

A. That's correct, they did not cause significant problems.

19

We do not agree with Lufkin, however, that the evidence conclusively established the *amount* of contract damages. Citing *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998), Lufkin argues that the measure of out-of-pocket damages—the difference between the amount paid and the value received—is the same for breach of contract as for fraudulent inducement. And because the jury found that Lufkin's out-of-pocket damages resulting from IBM's fraudulent inducement totaled $10,683,736, Lufkin contends that it conclusively established out-of-pocket contract damages of that same amount.

Lufkin's burden on appeal, however, is not that simple. We did not hold in *Formosa Plastics* that the out-of-pocket measure of damages applies identically to both contract and fraudulent-inducement claims, and we have found no other cases in which we have announced that holding. We need not decide that issue here, however, because we agree with IBM that the evidence does not conclusively establish that IBM's breach caused the exact same harm that its fraudulent inducement caused. As IBM asserts, we cannot tell from the jury's answer exactly *how* IBM breached the parties' contract, and the evidence certainly doesn't conclusively establish that it breached it in every way Lufkin alleged.

Having concluded that the evidence conclusively established that IBM's contractual breach caused Lufkin *some* damages but did not conclusively establish the amount of those damages, we agree with Lufkin that the proper remedy is to remand the case to the trial court for a new trial on that issue. *See Berry-Helfand*, 491 S.W.3d at 721 (remanding for new trial when legally sufficient evidence supported the fact of damages but did not support the entire amount the jury awarded). And because IBM disputed that it breached the parties' contract, the new trial must determine both

20

IBM's liability for breach and the amount of any resulting damages. *See Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001).

## V.
### Conclusion

For the reasons explained, we affirm the court of appeals' judgment as to Lufkin's common-law-fraud claim, reverse the judgment as to Lufkin's fraudulent-inducement and breach-of-contract claims, render judgment for IBM on the fraudulent-inducement claim, and remand this case to the trial court for a new trial on the breach-of-contract claim.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: March 15, 2019